JAMES A. WARNER AND AUDREY J. WARNER, ET AL.,[1] PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 5842–65, 5843–65, 5901–65. Filed April 24, 1967.

[1] The proceedings of the following petitioners are consolidated herewith: Roger G. Warner and Nancy L. Warner, docket No. 5843–65, and Jerrie D. Schooley and Leta J. Schooley, docket No. 5901–65.

*Myron E. Anderson*, for the petitioners.
*Gary C. Randall*, for the respondent.

Fay, *Judge:* Respondent determined the following deficiencies in income tax for the calendar year 1963:

| Docket No. | Deficiency |
| --- | --- |
| 5842–65 | $2, 312. 27 |
| 5843–65 | 284. 12 |
| 5901–65 | 1, 140. 46 |

The issue for decision in each docket is whether each set of petitioners sustained either a loss on "small business stock" in the year 1963 under the provisions of section 1244 of the Internal Revenue Code of 1954 on the liquidation of Ranchers, Inc., or a capital loss subject to the limitations provided under section 1211 (b).

### FINDINGS OF FACT

Some of the facts are stipulated and the stipulation of facts and exhibits attached thereto are so found.

Petitioners James A. Warner (hereinafter referred to as James) and Audrey J. Warner (hereinafter referred to as Audrey) timely filed a Federal joint income tax return for the calendar year 1963 with the district director of internal revenue, Boise, Idaho.

Petitioners Roger G. Warner (hereinafter referred to as Roger) and Nancy L. Warner (hereinafter referred to as Nancy) timely filed a Federal joint income tax return for the calendar year 1963 with the district director of internal revenue, Boise, Idaho.

Petitioners Jerrie D. Schooley (hereinafter referred to as Jerrie) and Leta J. Schooley (hereinafter referred to as Leta) timely filed a Federal joint income tax return for the calendar year 1963 with the district director of internal revenue, Boise, Idaho.

At the time of filing the petitions, the legal residence of all petitioners was Boise, Idaho.

Sewmor Sewing Center, Inc. (hereinafter referred to as Sewmor), an Idaho corporation wholly owned by James, is engaged in the sewing machine and vacuum cleaner sales business in Boise, Idaho. Sewmor had an excellent group of steady employees, averaging about 10 in number. Sewmor had not advertised for employees for a period of over 6 years although the industry experienced a substantial turnover in employees. James, Roger, and Jerrie were employees of Sewmor.

Ranchers, Inc. (hereinafter referred to as Ranchers), was a new domestic corporation organized under the laws of the State of Idaho with its principal place of business in Boise, Idaho. Its charter was

issued on December 29, 1961. At the first meeting of the board of directors of Ranchers held on January 5, 1962, James was elected president, Joanne Warner was elected vice president, and Howard M. Deeds was elected secretary-treasurer.

Ranchers' authorized capital was $100,000, divided into 10,000 shares of common stock at $10 per share. There was only one issue of stock which was common stock. At the time of incorporation there were three qualifying shares of stock issued.[2]

The purpose of incorporating Ranchers was to create an incentive for the employees to stay with Sewmor, an incentive to work harder, and also to give them a chance to save money and build up some assets for themselves. This objective was to be accomplished by having Sewmor's employees invest 7 percent of their salaries and commissions in a fund to be matched by Sewmor. Said fund proceeds were to be used to purchase stock in Ranchers. Also, at Ranchers' first meeting, the following resolution was unanimously adopted:

BE IT RESOLVED that 3,000 shares of stock of Ranchers, Inc., be, and the same is hereby, set aside and allowed for purchase by the trustees of the employees of Sewmor Sewing Center, Inc., pursuant to the trust agreement attached to these minutes, and that the corporation from said 3,000 shares sell stock of the corporation to the trustees at its book value but not less than par value, to wit: $10.00 per share; that upon receipt from the trustees of payment for said stock the same shall be issued to the trustees.

The trust agreement between Sewmor and its employees, alluded to in the resolution set out above, provided that if each employee agreed to have 7 percent withheld from his gross salary, Sewmor would contribute a like amount to the trust fund for the benefit of said employee. The trustees would use the funds as available to purchase stock in Ranchers. The trustees would subsequently transfer the stock to the employees. The 3,000 shares allotted were available for purchase only by the employees of Sewmor. Section (f) of the trust agreement provided as follows:

(f) When said allotted stock of Ranchers, Inc. to the amount of 3,000 shares has been purchased by Trustees or on the ——— day of ——————, 196—, whichever occurs earlier, this trust shall be terminated and all unused funds of each Second Party [employees of Sewmor] as shown by the account sheet of said Second Party shall be refunded to the Second Party entitled thereto and upon presentation of the trust and voting trust certificate of said Second Party to the Trustee, the stock represented by said trust and voting trust certificate shall thereupon be issued and delivered to said Second Party. * * *

At the time of the adoption of the aforesaid resolution the directors of Ranchers were considering using the proceeds from the sale of

---

[2] The parties stipulated that Ranchers qualified at that time as a small business corporation as defined by sec. 1244(c)(2), 1954 Code, insofar as the provisions of that paragraph defining the size and capitalization of a small business corporation are concerned.

Ranchers stock to Sewmor's employees to purchase commercial paper, to wit, sewing machine contracts. This plan, however, never materialized.

At the annual meeting of Ranchers' stockholders on February 15, 1963, it was decided to discontinue the plan to use the trustees and trust certificates. Issuance of the stock would be made directly to each stockholder. It was also resolved to allow the employees of Sewmor to purchase additional stock from the allotted 3,000 shares alluded to above.

At a meeting of Ranchers' stockholders and directors on February 18, 1963, it was decided to enter into a fire retardant program. They also decided (1) to purchase and did purchase a Northrup P-61 B airplane, and (2) to employ Robert E. Savaria as a pilot and issue 100 shares of Ranchers stock to him for his services performed in equipping the aircraft for fire-fighting purposes.

During the months of February, March, and April 1963, James and Audrey subscribed to and paid for 1,541 shares of common stock of Ranchers at a cost of $15,410. Certificate No. 9 representing such shares was issued to James on September 30, 1963. Said stock was paid for solely in cash. The stock was continuously owned by said petitioner until Ranchers was liquidated.

During the months of February through July 1963, Roger and Nancy subscribed to and paid for 261½ shares of Ranchers common stock at a cost of $2,615. Certificate No. 10 representing such shares was issued to Roger on September 30, 1963. Said stock was paid for solely in cash and was continuously owned by said petitioner until Ranchers was liquidated.

During the months of February through July 1963, Jerrie and Leta subscribed to and paid for 751 shares of Ranchers common stock at a cost of $7,510. Certificate No. 6 representing such shares was issued to Jerrie on September 30, 1963. The stock was paid for solely in cash and was continuously owned by said petitioner until Ranchers was liquidated.

On August 29, 1963, Ranchers' airplane was wrecked and Robert E. Savaria was killed. No insurance was carried on the plane, and the loss sustained made it impractical to continue on with the business.

At a corporate meeting held on November 21, 1963, the following resolution was unanimously approved:

BE IT RESOLVED, that Ranchers, Inc., abandon its corporate authority and forfeit its charter and dissolve, and that James A. Warner, the President, and Howard M. Deeds, the Secretary, are authorized to immediately pay all debts of the corporation, and that they be authorized and empowered to take any and all action, and to do any and all acts and things which may, in the judgment of the said officers, be necessary or proper to wind up the affairs of said corpora-

tion, and to distribute the assets, which consist chiefly of cash and accounts receivable, pro rata according to the respective interests of each shareholder.

In determining their taxable income for the calendar year 1963 on their Federal joint income tax return, James and Audrey deducted $13,161.97, Roger and Nancy deducted $2,233.51, and Jerrie and Leta deducted $6,414.52, all parties claiming that the amounts deducted constituted a "small business stock" loss under section 1244.

In separate notices of deficiency sent to each set of petitioners herein, respondent asserted that the losses sustained by petitioners in 1963 from the liquidation of Ranchers constituted a capital loss which cannot be treated as a loss from the sale or exchange of property other than a capital asset under the provisions of section 1244 or any other section of the Internal Revenue Code of 1954.

OPINION

The issue for decision is whether certain stock in Ranchers was section 1244 stock so as to entitle petitioners to ordinary loss treatment for losses suffered on their Ranchers stock when said corporation was liquidated in 1963. The relevant portions of section 1244 are as follows:

(a) GENERAL RULE.—In the case of an individual, a loss on section 1244 stock issued to such individual or to a partnership which would (but for this section) be treated as a loss from the sale or exchange of a capital asset shall, to the extent provided in this section, be treated as a loss from the sale or exchange of an asset which is not a capital asset.

* * * * * * *

(c) SECTION 1244 STOCK DEFINED.—

(1) IN GENERAL.—For purposes of this section, the term "section 1244 stock" means common stock in a domestic corporation if—

(A) such corporation adopted a plan after June 30, 1958, to offer such stock for a period (ending not later than two years after the date such plan was adopted) specified in the plan,

* * * * * * *

(C) at the time such plan was adopted no portion of a prior offering was outstanding,

(D) such stock was issued by such corporation, pursuant to such plan, for money or other property (other than stock and securities), * * *

* * * * * * *

Such term does not include stock if issued (pursuant to the plan referred to in subparagraph (A)) after a subsequent offering of stock has been made by the corporation.

* * * * * * *

(e) REGULATIONS.—The Secretary or his delegate shall prescribe such regulations as may be necessary to carry out the purposes of this section.

It is clear to us that any particular issue of common stock must meet all the definitional conditions enumerated in section 1244(c)(1)

in order to qualify as "section 1244 stock." However, we need not consider (1) whether at the time the alleged plan in issue was adopted no portion of a prior offering was outstanding; (2) whether the stock was issued, pursuant to the alleged plan, solely for money or other property; or (3) whether the plan herein was sufficient under section 1244(c)(1)(A), since we believe that any plan which Ranchers might have had failed to specify the period within which the offer to issue stock remained open as required by section 1244(c)(1)(A). Section 1244(c)(1)(A) requires (1) that such period must end not later than 2 years after the date on which the plan was adopted and (2) that such period of 2 years or less must be "specified in the plan."

The resolution adopted by Ranchers on January 5, 1962, as noted in its minutes, refers to the trust agreement between the employees of Sewmor and Sewmor itself. Section (f) of the trust agreement provides that said agreement would terminate on the earlier of the following: The date on which the allotted stock of Ranchers (3,000 shares) had been entirely purchased, or on some unspecified date.[3] Petitioners argue that since (1) they knew from past experience that the 7-percent withholding from the total payroll, plus the 7-percent matching fund, would require *approximately* 2 years in which to raise sufficient funds for the employees to purchase the 3,000 allotted shares and (2) the plan did in fact end within 2 years of its adoption, the requirement of section 1244(c)(1)(A) is satisfied.

We cannot agree with petitioners that external computations, particularly computations as essentially uncertain as those involved herein, satisfy the explicit requirements of section 1244(c)(1)(A) that the offering *must* end not later than 2 years after the date of the plan's adoption and that the period in question be "specified in the plan." Nor does the fact that the offering did in fact end within 2 years of the plan's adoption persuade us otherwise since the conditions of section 1244(c)(1) must be met at the time the alleged section 1244 stock is issued.

Although Congress may have intended to afford liberal treatment to losses of the type involved in section 1244, we are unable to hold that petitioners' actions constitute even minimum compliance with the requirement of section 1244(c)(1)(A).

Accordingly, we hold for respondent and, therefore,

*Decisions will be entered for the respondent.*

---

[3] Petitioners testified that they knew of no reason why the date in sec. (f) was left blank.