Mance T. Spillers and Mary J. Spillers v. Commissioner.
Spillers v. Commissioner
Docket No. 3997-64.
United States Tax Court
T.C. Memo 1967-216; 1967 Tax Ct. Memo LEXIS 43; 26 T.C.M. (CCH) 1069; T.C.M. (RIA) 67216; October 31, 1967
E. Jackson Boggs, for the petitioners. Vernon J. Owens, for the respondent. WITHEY
Memorandum Findings of Fact and Opinion WITHEY, Judge: Respondent determined deficiencies in petitioners' income tax of $3,864.38 in taxable year 1958, $7,008.53 in taxable year 1959, and $1,785.32 in taxable year 1961. Petitioners in an amended petition claimed an additional deduction in the amount of $12,500 for taxable year 1961, which amount was not claimed in the tax return filed for that year. The only issues for decision in this case are: (1) Whether the loss in 1961 on worthless capital stock to the extent of $50,000 thereof qualifies as a loss to which the provisions of section 1244 of the Internal Revenue Code of 1954[1] are applicable; and (2) Whether the $12,500 paid by petitioner Mance T. Spillers to the Marine Bank and Trust Company on December 7, 1961, qualifies *45 as an ordinary deduction to petitioners in the calendar year 1961, either as a business bad debt under section 166 of the Code, or as a business loss under section 165 of the Code. Findings of Fact Such facts as have been stipulated are so found. Mance T. Spillers (hereinafter sometimes referred to as the petitioner) and Mary J. Spillers are husband and wife who reside in Tampa, Florida. They filed their Federal joint income tax returns for taxable years 1958, 1959, and 1961 with the district director of internal revenue for the district of Jacksonville, Florida. Mary J. Spillers is a party to the proceeding only because she signed the joint returns. Issue 1 In 1958 petitioner was the owner of an unincorporated business known as Spillers Home Builders (hereinafter sometimes referred to as Home Builders), a business which was profitable at that time. Home Builders was in need of additional capital during 1958. Late in that year a tentative arrangement was devised whereby the unincorporated business might incorporate and "go public" for additional financing. In pursuance of this idea, *46 on December 13, 1958, a charter for incorporation of a corporation named Spillers Home Builders, Inc. (hereinafter sometimes referred to as Spillers), was filed with the Secretary of State of the State of Florida, providing for an authorized capitalization of 1,000,000 shares of $1 par value common stock. The authorized capitalization was not changed during the years relevant hereto. The incorporators were Dave Gordon, David M. Schwartz, William C. McLean, Barnard Prescott, and petitioner. Prior to October 2, 1959, no assets were transferred to Spillers, no stock was issued, and no business was commenced by it. Petitioner continued to seek additional financing and on October 2, 1959, a new proposal to utilize Spillers Home Builders, Inc., was put into effect, at which time petitioner transferred the home building business (theretofore known as Spillers Home Builders) to Spillers in exchange for certain of its capital stock. The business transferred to Spillers had a basis in petitioner's hands of $126,435.70 and had a determined fair market value of $218,085. At the same time certain other shares of capital stock in Spillers were issued for cash. The total amount of capital stock *47 issued in Spillers on October 2, 1959, and the consideration paid therefor according to its books, was as follows: [See table on following page.] The new proposal for the utilization of Spillers is reflected solely in the minutes and related documents of two special meetings of the board of directors and one special stockholders' meeting held on October 2, 1959, under which all the issued and outstanding stock of the corporation, as set forth above [below], was issued. Number of
Consideration for Transfer
shares
Issued to
Assets of business known as Spil-
111,043
Mance T. Spillers
lers Home Builders valued at
$111,043
107,042
Mary Jane Spillers
Assets of business known as Spil-
lers Home Builders valued at
107,042
4,000
Clayton W. Coleman
Cash
4,000
125,000
Grandoff Investments, Inc.
Cash
125,000
5,000
Barnard Prescott and Mary E.
Prescott, his wife
Cash
5,000
5,000
Carl H. Roch and Helen S.
Roch, his wife
Cash
5,000
25,000
Phillip B. Stapp
Cash (cancellation of $25,000 in-
debtedness)
25,000
382,085
$382,085
No other stock was ever issued by Spillers after October 2, 1959.
At the special *48 meeting of the board of directors held at 10 a.m. on October 2, 1959, written resolutions relating to each stockholder, reading as follows, were adopted: * * *
"WHEREAS Mance T. Spillers, doing business as Spillers Home Builders, a sole proprietorship has offered to assign and transfer to this Corporation all of the assets owned by him as of September 1, 1959, and used in connection with said sole proprietorship business at a net worth figure certified to as of September 1, 1959, by the accounting firm of Montenegro & Company, copy of which statement is attached to these minutes and which statement shows a net worth and dollar value of $218,085.00 for such assets. and WHEREAS, it is the judgment of the Board of Directors that the assets would be transferred to the Corporation are reasonably worth the amount of the consideration demanded therefor and that it is in the best interests of this Corporation to accept a transfer of such assets at the value of $218,085.00, Now, Therefore, BE IT RESOLVED, That the said offer to transfer the aforementioned assets of Mance T. Spillers to this Corporation be and the same is hereby accepted and approved and that the Corporation shall *49 as full payment for said assets issue and deliver to Mance T. Spillers or his nominees, 218,085 shares of the fully paid and non-assessable capital stock of this Corporation. FURTHER RESOLVED, That upon delivery to this Corporation of said assets and the execution and delivery of such instruments as may be necessary to transfer and convey said assets to this Corporation the proper officers are authorized and directed to issue and deliver shares of the capital stock of this Corporation in accordance with this resolution." * * *
"RESOLVED, That the proper officers be and they are hereby authorized and directed to issue and deliver 4000 shares of the capital stock of this Corporation to Clayton W. Coleman [for $4,000 cash already deposited with the Corporation]." * * *
"RESOLVED, That upon receipt by the Corporation of the sum of $125,000.00 from Grandoff Investments, Inc., that the proper officers of this Corporation be and they are hereby authorized and directed to issue and deliver 125,000 shares of the capital stock of this Corporation to Grand-off Investments, Inc., or its nominees." * * *
"RESOLVED, That the proper officers be and they are hereby authorized *50 and directed to issue and deliver to Barnard Prescott and Mary E. Prescott, husband and wife, 5,000 shares of the capital stock of this Corporation, and to Carl H. Roch and Helen S. Roch, his wife, 5,000 shares of the capital stock of this Corporation [for $10,000 cash already deposited with the Corporation]." * * *
"RESOLVED, That the proper officers be and they are hereby authorized and directed to issue to Phillip B. Stapp 25,000 shares of the capital stock of this corporation upon the cancellation of the indebtedness of the Corporation to Grand-off Investments, Inc. in the amount of $25,000.00. The Corporation agrees to pay the interest due on said obligation to date of cancellation of note and issuance of said stock to Phillip B. Stapp." At 2 p.m. on October 2, 1959, a special meeting of the stockholders was held at which time A. B. Grandoff, Jr., was elected as a director of the corporation. At 3 p.m. on October 2, 1959, a second meeting of the board of directors was held at which time petitioner presented to the meeting an agreement entitled "Stock Voting and Business Management Agreement" (hereinafter sometimes referred to as the Agreement). The board of directors *51 resolved that Spillers would recognize the terms of the Agreement and agree to carry out the appropriate provisions thereof. The Agreement provided in pertinent part: 1. * * * Notwithstanding any provision of the Charter or By-laws of the corporation providing or permitting otherwise, no presently authorized but unissued shares shall be offered or issued and no additional shares shall be authorized, offered or issued without the prior written consent thereof by the Designee of the Grandoff shares, as hereinafter provided, and except subject to pre-emptive rights in and to the purchase and acquisition of the same, on behalf of any holder or holders of the Grandoff shares unless and to the extent some or all of such pre-emptive rights shall be waived in writing by the shareholder or shareholders entitled to the same. * * *
3. The corporation and the said Spillers jointly and severally covenant and agree with Grandoff that all future expansion of the shell home building and financing business as presently being conducted by the corporation, together with all its ancillary phases and ventures including sale of insurance of all types, cabinet and mill-working operations and otherwise, *52 without limitation, in which the said Spillers, or the corporation or either of them presently have or may hereafter acquire any interest or participation either financially or through services rendered or to be rendered shall be conducted and operated by the corporation or some other corporation, as a wholly owned subsidiary of said corporation, provided, however, that this limitation shall not prevent the organization of one or more additional subsidiary or separate corporations for the purpose of conducting some or all of the business of the corporation as aforesaid so long as the said Grandoff together with any future shareholders who may acquire some or all of the shares to be purchased and held by Grandoff under the terms hereof are given first opportunity at an equal price to subscribe and participate in any such new corporation, such subscriptions and participation to be in the same proportion as the proportion of the Grandoff shares to the total shares of the corporation; * * * In 1961 Spillers became bankrupt. Petitioners stated in their joint income tax return for 1961 that they suffered a loss in 1961 to the extent of the basis of the property (i.e., $126,435.70) exchanged *53 for the capital stock in 1959. Petitioners claim that to the extent of $50,000, this loss qualifies as an ordinary loss pursuant to the provisions of section 1244 of the 1954 Code. On the 1961 joint income tax return petitioners claimed this loss to the extent of $50,000 as a net operating loss in accordance with section 1244 of the Code and subtracted it from the gross income shown on the return. The balance of the loss claimed in 1961 over the taxable income of that year, amounting to $33,291.70 was carried back to the taxable years 1958 and 1959 by petitioners as a net operating loss deduction, pursuant to an application for tentative carryback adjustment filed on April 16, 1962. In view of the additional ordinary business deduction of $12,500 claimed by petitioners in their amended petition to the Tax Court, petitioners now contend that the balance of the loss in 1961 over taxable income in that year amounts to $45,791.70 ($33,291.70 plus $12,500), and that this amount should be carried back to the taxable years 1958 and 1959. On June 29, 1962, respondent issued two documents entitled "Notice of Allowance of Tentative Carryback Adjustment" allowing a refund of $3,864.38, *54 plus interest of $114.39, for 1958, and $7,008.53, plus interest of $207.47, for 1959. Respondent, in his statutory notice of deficiency, determined that petitioner's loss described above was a long-term capital loss instead of loss to which section 1244 applied. As a result of this determination, respondent determined that there was additional taxable income in 1961 and no net operating loss carrybacks or carryovers to the taxable years of 1958 and 1959. Ultimate Findings Although there were no immediate plans to offer or issue more stock of Spillers, the parties, by the execution of the Agreement, did not intend to nor did they create an absolute limitation on the number of shares of its stock which could be issued to those issued on October 2, 1959. Should economic conditions have warranted a subsequent offering or issuance of Spillers' stock, under the Agreement there was no limitation on the aggregate amount of stock which Spillers could offer or issue. Issue 2 On February 12, 1959, petitioner endorsed a note of that date in the face amount of $24,000 under which S & S Fullform Tops, Inc. (hereinafter sometimes referred to as S & S), was the maker and, on September 2, 1959, petitioner *55 endorsed an additional note dated September 2, 1959, in the face amount of $10,000 of which S & S was also the maker. Petitioner was required to endorse these notes by the lender, the Marine Bank and Trust Company (sometimes hereinafter referred to as the Bank), and did so at a time when petitioner was the owner and operator of the unincorporated Home Builders business. S & S was a corporation organized in 1956 in the State of Florida with its main office in Tampa, Florida. During the period of time relevant to this issue, petitioner was a major stockholder of S & S, the total issued and outstanding shares of stock in that corporation being held as follows: Shares
Mance T. Spillers
50
Herman C. Snyder
50
Robert A. Hill
5 Snyder was vice president and shop manager of S & S from 1956 to January 1, 1960. S & S was formed for the purpose of utilizing a new process of manufacturing kitchen counter tops and bathroom vanity tops. This new process resulted in a postform top where a one-piece formica material was utilized in place of the older square-edged and laminated top which utilized contact glue. Of the tops made by S & S during the years 1956 to January 1, 1960, about *56 95 percent were kitchen counter tops and the remainder were vanity tops. No other products were made by S & S during these years. Although S & S had some individuals as customers, most of its products during 1956 to January 1, 1960, were purchased by dealers in custom-built cabinets, specifically Holiday Kitchens and Southern Made Kitchens. Petitioner, Home Builders, Spillers, Inc., and any other proprietorship or corporate business in which petitioner held an interest, in aggregate, purchased no more than 5 or 6 percent of the production of S & S during the years 1956 to January 1, 1960. Based upon an estimated monthly sales figure of from $10,000 to $12,000 in 1957 and 1958, and $15,000 in 1959, the maximum average yearly sales of S & S to the combined interests of Mance T. Spillers (as enumerated above) were within a range of from $6,000 to $8,640 in 1957 and 1958 and $9,000 to $10,800 in 1959. Total purchases of Home Builders were $120,211.24 in 1958 and $204,651.43 in 1959. Assuming the maximum dollar amount possible, i.e., $8,640 in 1958 and $10,800 in 1959, purchases from S & S were 5 percent in 1958 and 7 percent in 1959 of the total purchases of Home Builders in those *57 years. S & S rented its business premises pursuant to a lease dated April 1, 1958, effective to March 31, 1963, with petitioner and his wife, doing business as Spillers Builders Supplies, wherein the monthly rental was stated to be $300. Schedule G of petitioners' 1959 joint income tax return shows a total of $1,074.68 as received in 1959 from rents of petitioners' buildings. In requiring the endorsement of petitioner upon the notes of S & S, the Bank was primarily interested in the net worth statement of Mance T. Spillers and made the loan primarily on the basis of this statement. In connection with the above loans, petitioner furnished the Bank with several net worth or financial statements, including a statement dated December 31, 1958, designated "Mance T. Spillers T/A Spillers Supply Stores Financial Statement" which consisted of a balance sheet and an operating statement, and a financial statement dated January 31, 1959, designated "Mance T. Spillers Pro Forma Balance Sheet." The operating statement for the year 1958 and the Pro Forma Balance Sheet pertain to Spillers Home Builders while the Balance Sheet dated December 31, 1958, includes both the assets and liabilities *58 of Spillers Home Builders and other business ventures of petitioner and the personal assets and liabilities of petitioner. On December 7, 1961, petitioner, at a time when S & S was bankrupt, was required to and did pay all the principal balance of the S & S notes to the Bank in the total amount of $12,500. After the payment of the notes, any claim which petitioner acquired by virtue of such payment was worthless. Ultimate Finding The payment by petitioner of the debts of S & S which he guaranteed was not proximately related to any individual trade or business of petitioner separate from the trade or business of S & S. Opinion Issue 1 The first issue for decision is whether petitioners are entitled to an ordinary loss deduction on worthless capital stock pursuant to the provisions of section 1244 of the 1954 Code. [2]
*59 The nub of section 1244 is the adoption by a corporation of a plan, limited both in duration and amount by the specific requirements of that section. The regulations, section 1.1244(c)-1(c), Income Tax Regs., require that the plan referred to in the statute be in writing, that the corporation offer the stock under the plan during a period specified therein ending not later than 2 years after the plan is adopted, and that the plan must specifically state, in terms of dollars, the maximum amount to be received by the corporation in consideration for the stock to be issued pursuant thereto. Petitioner in this case argues that the requisite section 1244 plan of Spillers Home Builders, Inc., was spelled out in the written resolutions, including the written Agreement (termed the "Stock Voting and Business Management Agreement") which was made a part of the resolutions adopted by Spillers Home Builders, Inc., on October 2, 1959. Assuming, arguendo, that these resolutions satisfy the requirement that the plan be set forth in writing, the decision on this issue then turns on the question of whether these corporate resolutions constitute a plan limited in duration *60 and amount as required by section 1244. To this question, the answer must be no. Petitioner's arguments hinge on the effect of paragraph 1 of the Stock Voting and Business Management Agreement which provided that no authorized but unissued shares were to be offered or issued and no additional shares authorized without the consent of the major minority shareholder and then only subject to its preemptive rights, unless waived, to purchase such shares. However, there was no actual prohibition on the authorization of additional shares nor the offering or issuance of previously authorized shares, and at any time, and in any amount, further shares could have been offered if the parties to the Agreement so decided. It is difficult to see how a provision such as outlined above creates a plan to offer stock for a period (ending not later than 2 years after the date such plan was adopted) specified in the plan, as required by section 1244(c)(1)(A). In actual fact, there was no period specified in the plan and the stock could have been offered and issued indefinitely and as stated in James A. Warner, 48 T.C. 49 (1967): Nor does the fact that the offering did in fact end within *61 2 years of the plan's adoption persuade us otherwise since conditions of section 1244(c)(1) must be met at the time the alleged section 1244 stock is issued. In addition, section 1244(c)(2) contains a definition of a small business corporation which provides that at the time of the adoption of the plan, "the aggregate amount which may be offered under the plan" is, in effect, limited to $500,000 or less. Yet in this case, the only limit on the dollar amount encompassed in petitioner's would-be plan is the discretion of the minority stockholder in prohibiting the further issuance of stock, the exercise or nonexercise of which was clearly unforeseeable at the time of its adoption. [3] That more stock was, in fact, not issued or offered seems to be a result of economic conditions rather than any limitation in the arrangement itself. If a true limitation in the amount of stock were intended, the parties could have so provided in their agreement. *62 Petitioner thus has failed to establish that what was done in this case complies with the requirements of section 1244 and as was stated in Wesley H. Morgan, 46 T.C. 878, 889 (1966): section 1244 being designed to provide a tax benefit to a rather limited group of taxpayers as it is, we feel that qualification for those benefits requires strict compliance with the requirements of the law * * * Accordingly, we hold that the loss incurred by petitioners in 1961 on worthless capital stock fails to qualify as a loss to which the provisions of section 1244 apply and sustain respondent's determination on this issue. Issue 2 The second issue presented in this case is whether the $12,500 paid by petitioner in satisfying his personal guarantee of loans made by S & S, a corporation of which petitioner was a major shareholder, is deductible as either a business bad debt under section 166 of the Code or as a business loss under section 165 of the Code. In regard to petitioner's argument that the $12,500 paid on his guaranty is deductible as a business loss under section 165, the law has been well established that - instanter upon the payment by the guarantor of the debt, *63 the debtor's obligation to the creditor becomes an obligation to the guarantor * * * by subrogation. Thus, the loss sustained by the guarantor unable to recover from the debtor is by its very nature a loss from the worthlessness of a debt. * * * Putnam v. Commissioner, 352 U.S. 82 (1956), and is deductible only under the bad debt rather than the business loss section of the Code. The Internal Revenue Service has adopted this position in Rev. Rul. 60-48, 1960-1 C.B. 112, and it has been accepted in numerous subsequent cases. In the face of this authority, petitioner cites Main v. United States, an unreported case ( D. Wash. 1966, 18 A.F.T.R. 2d 5601, where the Court held, without explanation, that unpaid cash advances were deductible "as trade or business expense, as a business loss, and as a bad debt." Despite the above case, the law remains clear that losses on a guaranty are deductible, if at all, under the bad debt section of the Code only. Petitioner's primary argument in regard to the $12,500 payment is that it is a business bad debt as defined in section 166(d)(2) [4] and thus deductible in full in the year that it became worthless *64 (here conceded by both parties to be the taxable year 1961). Respondent, on the other hand, argues that the bad debt is nonbusiness in nature and thus deductible only as a shortterm capital loss. [5]
Section 1.166-5(b)(2), Income Tax Regs., provides that - the character of the debt is to be determined by the relation which the loss resulting from the debt's *65 becoming worthless bears to the trade or business of the taxpayer. If that relation is a proximate one in the conduct of the trade or business in which the taxpayer is engaged at the time the debt becomes worthless, the debt comes within the exception * * * [i.e., it is a business bad debt.] While it is clear that the business of a corporation is not that of its stockholders or officers, it is established that there are circumstances under which the payment by a stockholder of a debt of his corporation which he has guaranteed is proximately related to an individual trade or business of the stockholder separate from the corporate business so that the loss from any such payment is deductible as a worthless business bad debt. See, e.g., j. t. d/orminey, 26 T.C. 940 (1956); R. B. Cowden, 34 T.C. 819 (1960); and Wilfred J. Funk, 35 T.C. 42 (1960). Petitioner has the burden of proving such a proximate relation between the loss on the guaranty and his trade or business, herein the unincorporated business of petitioner, Spillers Home Builders. Petitioner advances the following three reasons in support of his contention that his payment of S & S's *66 notes was proximately related to his unincorporated businesses' activities: (1) the guaranty was made in order to secure for Home Builders the dependable source of supply of materials manufactured by S & S; (2) it was made in order to protect petitioner's reputation in the homebuilding business; and (3) because S & S was a lessee of a building owned by Home Builders. [6]
In regard to petitioner's first contention, it has been held that losses incurred in attempting to maintain sources of supply may be treated as business bad debts. Cf. J. T. Dorminey, supra; Mac Levine, 31 T.C. 1121 (1959). However, in those cases, there was an element of necessity that is lacking in the instant case. In Dorminey, taxpayer was in the produce business. In that business he had a market for two carloads of bananas per week but could not obtain them because of economic conditions. Taxpayer then made loans to a corporation of which he was a major shareholder, which was formed for the purpose of making bananas available to him. Upon the worthlessness of these loans, taxpayer *67 was allowed a business bad debt deduction because the loss was incidental to and proximately related to taxpayer's produce business. In Levine, taxpayer was in the business of manufacturing springs for furniture and bedding. During the course of the business taxpayer determined that his customers needed fabrics in addition to springs. The market for fabrics was tight with the result that it was difficult to sell springs unless taxpayer's customers had a fabric source. In these circumstances, taxpayer organized a fabric manufacturing company, to which he subsequently loaned money, which loans eventually became worthless. Taxpayer was allowed a business bad debt deduction. This requirement of necessity is demonstrated most clearly in the case of Edward Koppelman, 27 T.C. 382 (1956). In that case taxpayers were a partnership in the beverage distribution business. In 1946, when beer was difficult to obtain, the taxpayers bought a brewery to produce beer for their distribution. In 1947 and 1948, beer was readily available. The taxpayers therefore converted the brewery to the production of ale to be sold in 6-ounce bottles as a "gimmick." During 1947 and 1948, taxpayers made *68 advances to the brewery, which advances became worthless in 1948. The Court held the bad debts to be nonbusiness in nature on the reasoning that there is no proximate relation to the taxpayer's business where the advances to the debtor are not a necessary prerequisite for the creditor-taxpayer acquiring the product manufactured by the debtor. In the present case the record does not show that Home Builders was required to guarantee loans of S & S in order to maintain its supply of kitchen tops. There is no showing that the market was tight or that for any reason there would be difficulty or additional cost in obtaining kitchen tops from other sources than S & S. There likewise was no showing of any benefit running to Home Builders by virtue of S & S's remaining in business. Furthermore, although the exact figures are uncertain, the percentage of the purchases from S & S in relation to the total purchases of Home Builders was approximately 7 percent in 1958 and 5 percent in 1959. We conclude, therefore, that S & S was a relatively minor supplier of Home Builders, and without some further showing of a reason for so doing, the guaranty of $34,000 worth of S & S's notes and payment of *69 $12,500 thereon by petitioner cannot be considered as proximately related to petitioner's homebuilding business. Petitioner's second contention is that the bad debts are business in nature because they were incurred in order to protect his reputation and credit in the building industry. In an analogous area concerning the question of whether payments made to protect one's business reputation and credit are deductible as an ordinary and necessary business expense under section 162 of the Code, case authority is of little aid to decision. A conclusion, however, which may be drawn from such authority is that there must be a strong showing that the continued success of the individual taxpayer's business is in some manner dependent upon the financial position of the debtor corporation. Cf. Dodd v. Commissioner, 298 F. 2d 570 (C.A. 4, 1962). In the present case, petitioner argues that Home Builders and S & S had many of the same customers and thus the failure of S & S would damage the business of Home Builders. However, the other major stockholder of S & S testified that although some customers of S & S were individual purchasers for their own use, most of its products *70 were sold to dealers in custom-built cabinets who used the kitchen tops in their products. This is far from satisfactory proof of petitioner's basic argument, i.e., that the customers of S & S were also the customers of Home Builders. As for petitioner's argument that the failure of S & S would have adversely affected Home Builders' business credit, petitioner's testimony on this point was as follows: Spillers Home Builders had a good reputation with the banks, and if my being sold on Spillers Home Builders allowing S & S to fail, it would certainly hurt the reputation of Spillers Home Builders * * * Aside from this unsubstantiated statement of petitioner, there is nothing in the record to show why or in what manner the credit of petitioner would have been affected by S & S's failure. Therefore, the facts shown are not sufficient to establish that his credit would have been lessened thereby, and without such a showing, petitioner's argument on this point must fail. As for petitioner's third argument, i.e., that he financially assisted S & S so that it could remain as the tenant of Home Builders, thus guaranteeing the continued receipt of $300 per month rental, a similar contention *71 was raised in Albert J. Harvey, 35 T.C. 108 (1960). In that case, the taxpayer agreed to indemnify a $30,000 guarantee by another to the lessee, in order, so he argued, to assure a $1,200 per month rental. The Court, in considering taxpayer's argument for business bad debt treatment, stated: The record herein contins no evidence tending to show that petitioner's building was usable only by * * * [lessee] or that another tenant for the building was not readily available at the same or greater rental than that paid by * * * [lessee]. Absent such evidence, there is no showing of a sufficiently proximate relationship between petitioner's rental activities and the indemnity agreement to the guarantor of the * * * [lessee's] loan to bring this case within the holdings of the cases cited by petitioner. [7]
*72 In the instant case petitioner guaranteed $34,000 worth of notes in order, so it is said, to assure a monthly rental of $300 or less. [8] Although petitioner at the hearing testified that the building in which S & S was lessee "was built especially for them," there is nothing in the record to indicate that the building could not therefore be rented to others. As regards the availability of another tenant at the same or higher rent, again the record is silent. As held in Albert J. Harvey, supra, absent such evidence, there is no business bad debt. Accordingly, *73 we are of the opinion that the amounts paid by petitioner pursuant to his guaranty do not qualify as a business bad debt under section 166 and we also sustain respondent on this issue. Decision will be entered under Rule 50. Footnotes
1. All references are to the Internal Revenue Code of 1954 unless otherwise stated.↩
2. SEC. 1244. LOSSES ON SMALL BUSINESS STOCK. (a) General Rule. - In the case of an individual, a loss on section 1244 stock issued to such individual or to a partnership which would (but for this section) be treated as a loss from the sale or exchange of a capital asset shall, to the extent provided in this section, be treated as a loss from the sale or exchange of an asset which is not a capital asset. * * *
(c) Section 1244 Stock Defined. - (1) In General. - For purposes of this section, the term "section 1244 stock" means common stock in a domestic corporation if - (A) such corporation adopted a plan after June 30, 1958, to offer such stock for a period (ending not later than two years after the date such plan was adopted) specified in the plan, (B) at the time such plan was adopted, such corporation was a small business corporation, * * *
(2) Small Business Corporation Defined. - For purposes of this section, a corporation shall be treated as a small business corporation if at the time of the adoption of the plan - (A) the sum of - (i) the aggregate amount which may be offered under the plan, plus (ii) the aggregate amount of money and other property (taken into account in an amount, as of the time received by the corporation, equal to the adjusted basis to the corporation of such property for determining gain, reduced by any liabilities to which the property was subject or which were assumed by the corporation at such time) received by the corporation after June 30, 1958, for stock, as a contribution to capital, and as paid in surplus, does not exceed $500,000; and (B) the sum of - (i) the aggregate amount which may be offered under the plan, plus (ii) the equity capital of the corporation (determined on the date of the adoption of the plan), does not exceed $1,000,000.↩
3. Because there is no specific dollar amount of stock to be issued pursuant to petitioner's would-be plan, petitioner also runs afoul of the requirement, already noted, in sec. 1.1244(c)-1 (c), Income Tax Regs.↩, that the plan state, in terms of dollars, the maximum consideration to be received by the corporation for the stock to be issued.
4. SEC. 166. BAD DEBTS. * * *
(d) Nonbusiness debts. - * * *
(2) Nonbusiness Debt Defined. - For purposes of paragraph (1), the term "nonbusiness debt" means a debt other than - (A) a debt created or acquired (as the case may be) in connection with a trade or business of the taxpayer; or (B) a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business. ↩
5. SEC. 166(d)(1) General Rule. - In the case of a taxpayer other than a corporation - (A) subsections (a) and (c) shall not apply to any nonbusiness debt; and (B) where any nonbusiness debt becomes worthless within the taxable year, the loss resulting therefrom shall be considered a loss from the sale or exchange, during the taxable year, of a capital asset held for not more than 6 months.↩
6. Petitioner makes no claim here that he was in the business of either promoting or lending money to corporations.↩
7. The cases relied on by "petitioner," although not enumerated in the Court's opinion, are there stated to involve loans to or purchases of stock in an enterprise which was a supplier of raw materials necessary to the taxpayer's trade or business, wherein it was held that the controlling motive of the loan or purchase was sufficiently connected with the taxpayer's business to cause the resultant losses to be treated as business bad debts or ordinary and necessary expenses of the taxpayer.↩
8. The lease states the monthly rental to be $300 per month. However, petitioner's income tax return for 1959 showed only $1,075.68 as total gross rental income. This lesser figure is explained in petitioner's brief by citing the deep financial trouble of S & S and then stating, "Under these circumstances, is it surprising to Respondent that S & S was in arrears with regard to its rental payments?" The arrearage is not surprising, but what is surprising is that petitioner now attempts to argue that his motive in guaranteeing the notes was to preserve S & S as a tenant, when the tenant was unable to pay its rent.↩