Henry A. Childs and Carol M. Childs v. Commissioner.
Childs v. Commissioner
Docket No. 993-66.
United States Tax Court
T.C. Memo 1968-59; 1968 Tax Ct. Memo LEXIS 239; 27 T.C.M. (CCH) 322; T.C.M. (RIA) 68059; April 9, 1968. Filed John H. Falsey, 425 Park Ave., New York, N. Y., for the petitioners. Charles M. Costenbader and Irving Bell, for the respondent. HARRON Memorandum Findings of Fact and Opinion HARRON, Judge: The respondent determined for 1960 and 1961 income tax deficiencies of $5,669.83, and $4,283. Each deficiency *241 results from respondent's disallowances of deductions in 1960 and 1961 of claimed loss carrybacks from 1963. The claimed net operating loss deductions were attributable to a loss sustained in 1963 from the worthlessness in 1963 of 915 shares of stock of Yankee Productions, Inc., a small business corporation. The issue is whether the loss was a capital loss under sections 165(f) and 165(g)(1) of the code, as respondent determined, or was an ordinary loss under section 1244(a), as petitioners contend. Determination of the issue depends upon whether the shares of stock involved were so-called "section 1244 stock" which were issued pursuant to a "plan", as defined in section 1244(c)(1)(A). Findings of Fact The stipulated facts are so found and are incorporated herein by reference. In 1961-1964, petitioners were residents of Darien, Connecticut. They are now residents of Leola, Pennsylvania. They filed joint income tax returns with the district director of internal revenue in Hartford, Connecticut. Henry A. Childs is referred to herein as the petitioner. Yankee Productions, Inc. is a Connecticut corporation that was organized on July 18, 1960. Its originally authorized capital stock *242 was 500 shares of a par value of $100 per share. In June 1962 its authorized capital stock was duly increased to 1,000 shares of the same par value. The sole business of Yankee was the production of the motion picture, "Panic Button." Prior to December 31, 1963, Yankee did not earn or realize any gross receipts from any source. At various times beginning in October, 1960 and ending in April 1961 petitioner purchased for cash 915 shares of stock of Yankee. Yankee was a small business corporation, as defined in section 1244(c)(2) on the dates when petitioner made the several purchases of stock. However, respondent does not agree or concede that there was in existence a "plan," as described in section 1244(c), at the time when Yankee otherwise qualified as a small business corporation. Under circumstances set forth in more detail later, petitioner purchased the shares of stock involved on the dates and for the amounts, as follows: Date of Purchase
PurchasePrice
Number of Shares
October 21, 1960
$15,000
15
January 4, 1961
25,000
100
March 28, 1961
3,000
300
April 12, 1961 16,000
500
Total
$59,000
915
On December 31, 1963, all of the stock *243 of Yankee owned by petitioner was worthless. On October 21, 1960, January 4, 1961, and March 28, 1961, there was no portion of a prior offering of the stock of Yankee outstanding. Petitioner purchased 15 shares of stock of Yankee for $15,000 pursuant to a resolution, as shown in minutes, adopted at a special meeting of the board of directors of Yankee held on October 21, 1960. The stock was paid for on the date of purchase. The minutes are, in part, as follows: Mr. Risola stated that the purpose of the meeting was to consider the issuance of fifteen shares of stock to Henry Childs for the sum of $15,000 to be paid in cash. After some discussion, it was unanimously agreed to consumate [sic] the sale. 323 There being no further business, the meeting was adjourned. Petitioner purchased 100 shares of stock of Yankee for $25,000 pursuant to a resolution adopted at a special meeting of the board of directors of Yankee held on January 4, 1961. The stock was paid for on January 4, 1961, $3,500, and on January 5, 1961, $21,500. The minutes state, in part, as follows: Mr. Ron Gorton stated that the purpose of the meeting was to consider the issuance of 100 shares of stock *244 to Henry Childs, for the sum of $25,000.00 to be paid in cash. After some discussion, it was unanimously agreed to accept the offer of Henry Childs. There being no further business, the meeting was adjourned. Petitioner purchased 300 shares of stock of Yankee for $3,000, and 500 shares for $16,000, pursuant to a resolution adopted at a special meeting of the stockholders of Yankee held on March 28, 1961. The stock was paid for on March 29, 1961, $14,917.50, and on April 12, 1961, $4,082.50, in the total sum of $19,000. The minutes state, in part, as follows: Greg Michie pointed out that the method for raising additional capital discussed at the last special meeting on March 20, 1961, had not materialized. After much discussion, on past expenditures and possible methods of raising additional capital, it was decided to issue the additional 300 authorized shares to Henry Childs for $3,000.00 to be paid in cash, and to obtain an additional issue of 500 shares of common stock of the par value of $100.00 and sell same to Mr. Childs for $16,000.00. A motion to do the same was duly made and carried. Mr. Christopher Risola tendered his resignation as president, which was accepted. *245 A motion was then duly made and carried that the office of assistant treasurer be abolished. After discussion, another motion was duly made and carried that either Mr. Childs or Mr. Michie be authorized signers of all checks of the corporation. There being no further business, the same was, on motion, duly adjourned. The only evidence of a "plan", within the meaning of section 1244(c)(1)(A), to sell a specified amount of stock to petitioner pursuant to his offer to purchase such stock, consists of the minutes of the 3 meetings held on October 21, 1960, January 4, 1961, and March 28, 1961, two of which were meetings of the board of directors, and one was a special meeting of the stockholders. Ultimate Findings of Fact At the various times of the issuance of the 915 shares of stock of Yankee to petitioner, Yankee did not have in existence a plan for the issuance of stock, as described in, and within the meaning of section 1244(c)(1)(A). Therefore, petitioner's loss in 1963 from the worthlessness of the stock in 1963 is not deductible as an ordinary loss under section 1244(a); rather it is deductible as a capital loss under sections 165(f) and 165(g)(1). Opinion The question *246 is whether there was a "plan," within the meaning of section 1244(c)(1)(A) of the code, in existence at the time of each instance of the issuance of shares of stock of Yankee to petitioner. The question must be and is decided for the respondent. His determinations are sustained. See the following cases: James A. Warner, 48 T.C. 49; and Wesley H. Morgan, 46 T.C. 878, 889. See, also, South Penn Oil Co., 17 T.C. 27, 47; and Estate of Jan Williem Nienhuys, 17 T.C. 1149, 1161, where this Court noted, in substance, that the meaning of a word, or term, for purposes of an unrelated statute, does not carry over and fix the meaning of the same word, or term, in the controlling provision of an applicable revenue act. See, also, Rev. Rul. 66-67, 1966-1 C.B. 191; Income Tax Regulations, section 1.1244(c)-1(c); and H. Rept. 2198, 85th Cong., 1st Sess. (1958), 1959-2 C.B. 709, 714-15. Section 1244(c)(1)(A) provides: For purposes of this section, the term "section 1244 stock" means common stock in a domestic corporation if - (A) such corporation adopted a plan after June 30, 1958, to *247 offer such stock for a period (ending not later than two years after the date such plan was adopted) specified in the plan. Section 1244(e) directs the Secretary to promulgate such regulations as may be necessary to implement the statute. Pursuant to that authority, regulations have been adopted, section 1.1244(c)-(c)(1), Income Tax Regs., which state in part that the 2-year requirement [of section 1244(c)(1)(A)] will be met if it is clear that such period will end, and does in fact end, within 2 years after the plan is adopted. The statutory language, and the regulations, thus, clearly contemplate a time limitation which is stated in the 324 plan, at the time the plan is adopted, rather than one which might be supplied later through an application of some sort of hindsight, as petitioner argues. In Wesley H. Morgan, supra, p. 889, in holding inter alia that the regulation, section 1.1244(c)-1(c), requiring that the plan be in writing is valid, this Court stated as follows: * * * section 1244 being designed to provide a tax benefit to a rather limited group of taxpayers as it is, we feel that qualification for those benefits requires strict compliance with *248 the requirements of the law and the regulation promulgated pursuant to the specific instructions therefor included in section 1244(e). In this case, under the regulation, it is necessary to make the finding that the statutory requirements have not been met. That regulation already has received approval by this Court. This Court recently has reaffirmed its position as to the validity of section 1.1244 (c)-1(c) of the regulations. In James A. Warner, supra, the corporation, in which the taxpayer had made an investment, determined to offer certain of its stock for sale to employees of its parent. It was assumed, for purposes of discussion, that the resolution and trust agreement, to which the resolution referred, constituted together a plan, but there was the question whether the plan satisfied the 2-year requirement of section 1244(c)-(1)(A). There, as here, the taxpayer argued that it was apparent that all of the stock was in fact issued within a 2-year period. In rejecting the taxpayer's argument and holding that the stock in question did not qualify for section 1244 treatment, this Court stated, p. 54, as follows: Although Congress may have intended to afford liberal *249 treatment to losses of the type involved in section 1244, we are unable to hold that petitioners' actions constitute even minimum compliance with the requirement of section 1244(c)(1)(A). Our conclusion must be and is that none of the resolutions adopted by the directors, or the stockholders, of Yankee corporation, involved here, (as shown by the minutes of 2 directors' and 1 stockholders' meetings) pursuant to which the corporation sold shares of stock to petitioner at stated prices, on the basis of petitioner's offers to buy the stock at the stated prices, constituted a "plan" such as is contemplated by and within the meaning of section 1244(c)(1). Section 1244 (c)(1)(D) states in part that in order for stock to qualify as "section 1244 stock," it must be issued pursuant to a plan, as defined in section 1244(c)(1)(A). As has been conceded by petitioner's counsel, the only evidence of such plan is, in each instance, a resolution adopted by either the board of directors or the stockholders to sell a stated number of shares of stock to petitioner for a stated price. Such corporate action, or actions, did not meet the Congressional intendment of section 1244(c)(1)(A). All that the *250 resolutions establish is, in each instance, the simple acceptance of an offer, to purchase a certain number of shares of stock, i.e., the entering into a contract to sell some shares of stock. The weakness of the petitioner's position is demonstrated by the admission of his counsel during the trial, who observed: This wasn't a public offering kind of thing, which in a sense seems to be contemplated by the statute and regulations. I think the drafters of this legislation may have gone a little bit astray in not keeping the practical operation of the ordinary small business corporation in mind, and the term "offer" for a period contemplates an offer to the public generally, which was just not the case here. In discussing just what was intended by use of the words "plan" and "offer" in section 1244(c)(1)(A), the House committee report employs such phraseology as "a plan to offer", "a prior offering to issue stock", and "[if] such an offer is outstanding"; H. Rept. 2198, 85th Cong., 1st Sess. (1958) 1959-2 C.B. 709, 714-15, supra. It is clear that Congress intended (just as counsel for petitioner concedes) that in order for the benefits of section 1244 to be available, *251 the requisite "plan" must consist of something more than a simple acceptance by a corporation of an offer to buy its stock. The evidence does not establish here that there was a "plan" within the meaning of section 1244 (c) (1) (A). No mention was made in the resolutions adopted and in the minutes of each meeting of a corporate intention to offer stock for sale, as a general matter, during a 2-year period. There was no "offering" within the meaning and intendment of the statute. All of the shares involved simply were sold to petitioner, under the corporation's acceptance of petitioner's prior offer to buy the shares. No period of time was stated or specified in the resolutions or minutes during which there would be a general offering of stock under a plan. It is immaterial that in the instances involved here all of the shares purchased of petitioner were issued within a 2-year period. 325 There was not a plan within the intendment and meaning of the statute. The 2-year, or less, requirement in the statute is one which must be "specified in the plan". James A. Warner, supra, p. 54. In order for a document to constitute a written plan under section 1244 (c)(1)(A), *252 the provisions and wording of the document must satisfy the minimum requirements of the statute; it must clearly reflect a corporate decision to offer the corporation's stock during a stated period of time, subject to the 2-year requirement, and the stated period of time must be specified in the plan itself. It is concluded that the corporate actions of Yankee, taken separately or together, in agreeing to sell shares of stock to petitioner, as evidenced by the corporate resolutions set forth in the minutes of the 3 meetings, did not constitute the adoption of a written plan within the requirements of the statute; and that the resolutions and minutes did not constitute a written plan as is contemplated by the statute. The legislative history of the applicable statute does not indicate that the Congress intended that every, or the simple purchase of shares of stock in a small business corporation, as defined in section 1244 (c)(2), qualifies for the benefits of section 1244. Decision will be entered for the respondent.