Estate of A.M. Saperstein, Deceased, Allan R. Block and Continental Illinois National Bank and Trust Co. of Chicago, Co-executors, and Sylvia Saperstein v. Commissioner.
Estate of Saperstein v. Commissioner
Docket No. 3934-66.
United States Tax Court
T.C. Memo 1970-209; 1970 Tax Ct. Memo LEXIS 150; 29 T.C.M. (CCH) 916; T.C.M. (RIA) 70209; July 23, 1970, Filed. *150 Abe Saperstein, who was sole proprietor of the Harlem Globetrotters basketball team, advanced funds to the American Basketball League in order to help it meet operating expenses. These loans subsequently became worthless and taxpayer deducted the total amount thereof as a business bad debt on hisincome tax return for 1962. Held, the advances were proximately related to Abe Saperstein's soleproprietorship, the Harlem Globetrotters. Accordingly, he is entitled to a business bad debt deduction therefor. Harvey M. Silets, Suite 1814, 7 South Dearborn St., Chicago, Ill.,for the petitioners. Nelson E. Shafer, for the respondent. 917 IRWIN
Memorandum Findings of Fact and Opinion IRWIN, Judge: *151 The Commissioner determined a deficiency in petitioners' income tax for the calendar year 1962 in the amount of $26,040.18. Since petitioners conceded certain issues at trial and on brief, the sole issue remaining for consideration is whether certain loans by the late A.M. Saperstein to the now-defunct American Basketball League, which became worthless in 1962, constituted business or nonbusiness bad debts in that year. Findings of Fact Some of the facts have been stipulated and they, together with the facts reflected in the exhibits, are incorporated herein by reference. Petitioners are the Estate of A.M. Saperstein, deceased (hereinafter petitioner or Abe Saperstein) and his surviving wife, Sylvia Saperstein. Allan R. Block and Continental Illinois National Bank and Trust Co. of Chicago are the executors of petitioner's estate. The late A.M. Saperstein, who died on March 15, 1966, and Sylvia Saperstein timely filed a joint Federal income tax return for the year at issue with the district director of internal revenue, Chicago, Ill. At the time of the filing of the petition herein, Sylvia Saperstein was residing in Chicago, and the estate of A.M. Saperstein, deceased, was *152 being administered in Illinois. The late A.M. Saperstein was the owner and coach of the Harlem Globetrotters (sometimes referred to herein as the HGT or the Globetrotters). The HGT had been formed by petitioner late in 1926 and had acquired international recognition as a Negro basketball team. Petitioner operated the HGT and his other activities as a sole proprietorship known as A.M. Saperstein Sports Enterprises until his demise in 1966. The Globetrotters, which functioned as an independent traveling organization separate and apart from any basketball league or other organization, were reputed to be "the most sought after athletic organization in the entire world" because of their unusual ability to combine basketball prowess with clowning tactics that amused basketball and other sports fans alike. The Harlem Globetrotters' basketball schedule consisted of approximately 150 to 170 games played over the course of a season starting sometime near October of one year and extending to March or April of the following year. Because of the full schedule of games, the Globetrotters could not play more than a few times in any one location during any particular season. For example, the *153 team played in larger cities such as New York and Chicago only two or three times each season during the late 1950's and early 1960's. Prior to the formation of the American Basketball League (hereinafter sometimes the ABL) in 1961, the National Basketball Association (hereinafter the NBA), a professional basketball league formed in about 1947, was operating franchises in eight cities in and east of St. Louis, Mo., and Minneapolis, Minn. Petitioner believed that the Harlem Globetrotters were largely responsible for the growth of the NBA during the first 12 or 13 years of its existence because of the ability of the HGT to draw basketball fans to sites at which games involving the Globetrotters and NBA teams were played. Prior to the formation of the ABL, petitioner had been interested in obtaining an NBA franchise in Los Angeles, but instead the NBA permitted the Minneapolis Lakers to relocate there. Furthermore, efforts to obtain an NBA franchise in San Francisco did not materialize since the NBA insisted upon a franchise fee of approximately a quarter of a million dollars. Petitioner felt that the NBA should have granted him a franchise without requiring a fee because of all that *154 he had done to help insure the success of the NBA. Abe Saperstein owned a stock interest in the Philadelphia Warriors, an NBA team, which stock he sold sometime prior to December 18, 1960. It was through this stock interest that petitioner attempted to prevail upon the NBA to expand the league and to make certain rule changes which would, according to petitioner, make the game of basketball more interesting and appealing to fans. However, these efforts were not fruitful, and Abe Saperstein himself likened them to the proverbial "voice in the wilderness." Thereafter, sometime in October or November 1959, "Mr. Basketball," as petitioner was known throughout the world of sports, started to lay the foundation for the formation of the ABL. The ABL was formally organized on June 3, 1961, and it filed U.S. corporation income tax returns for the taxable years June 1, 1961, through May 31, 918 1962, and June 1, 1962, through April 30, 1963, respectively. Prior to June 3, 1961, the ABL was not organized in any real sense of the word, but rather it was composed of interested parties (both individuals and corporations) who, along with petitioner, were laying the groundwork for the American *155 Basketball League. Among the reasons cited for the formation of the ABL were the following: (1) to expand the scope of organized professional basketball and provide new opportunities for graduating college players; (2) to please the general public; and (3) to make certain rule changes and provide a more interesting and varied style of play. Abe Saperstein had expressed as early as March 1960 his ambitions in organizing a new basketball league and articulated, in particular, three personal interests in forming the league. These were as follows: (1) the league and its operation; (2) the operation of the Harlem Globetrotters; and (3) to own and operate a club in the league when the time was judicious. At a meeting with respect to the formation of the ABL, held on March 24, 1960, petitioner admitted to the other parties interested in a new league that he "would like to own a good club in a good league." However, he insisted that "getting the league in operation would be [of] primary and first-line importance." Saperstein made three requests of the prospective ABL franchise holders, viz.: (1) first refusal on the sale of any club if a club was sold; (2) first right *156 to take over any franchise which is forfeited; and (3) the right to take in any new city in keeping with league needs or desires. Petitioner was prevailed upon by ABL club owners to serve as commissioner of the ABL because it was thought that his reputation and his many years of experience in the field of basketball would prove invaluable to the success of the new basketball circuit. He agreed to serve gratuitously for two years, at the end of which time he expected that the ABL owners would probably retain him as commissioner at a substantial salary. In the event that he were not retained as commissioner, petitioner anticipated taking over the operation of an ABL franchise. Abe Saperstein used the personnel and office space of A.M. Saperstein Sports Enterprises to perform the many administrative duties he had undertaken as commissioner of the new basketball league. At its inception, the ABL planned to locate teams in Washington, D.C.; Cleveland, Ohio; Chicago, Ill.; Kansas City, Mo.; Los Angeles and San Francisco, Calif. Subsequently, Pittsburgh, Pa., and Portland, Ore., were added as possible franchise sites, but Honolulu, Hawaii, was later substituted for Portland. During *157 this initial period of organization, there were a few more additions and substitutions so that by July 1, 1962, the ABL had six franchises in Pittsburgh, Philadelphia, Kansas City, Baltimore, Cleveland, and Chicago. By September 17, 1962, Oakland and Long Beach, Calif., had replaced Baltimore and Cleveland. While it was certain that six teams in the ABL could have been ready to play in the 1960-1961 basketball season, it was decided to postpone ABL competition for a year, by which time, it was anticipated, eight teams would be ready to play the 1961-1962 season. The ABL had its share of organizational problems in the winter of 1960. Morrie Shneer, executive vice-president of Son-Mark Industries, Inc. (hereinafter Son-Mark), which had agreed to take over the Chicago franchise, notified Abe Saperstein in mid-December 1960 that Son-Mark would not be able to operate the Chicago franchise due to certain unforeseen factors, including inability to secure an adequate playing site. Since the original plans for the 1961-1962 season entailed eight ABL teams, it was considered important to locate someone to take over the franchise which Morrie Shneer and Son-Mark had declined. Although, *158 petitioner had been interested in obtaining the ABL San Francisco franchise, his attorneys suggested that it would be in the better interests of the ABL to leave the San Francisco franchise in the hands of local representation. Since Morrie Shneer and Son-Mark had already declined the Chicago franchise as of December 1960, petitioner was advised by his attorney in January 1961 to "move into the Chicago 'picture'" where there would be opposition from a newly established NBA team. Historically, Chicago had not provided a successful location for professional basketball. Several teams had failed there, 919 such as the Chicago Stags, and it was considered as the "graveyard" of professional basketball. Despite this background, Abe Saperstein agreed to accept the Chicago franchise in the ABL. His expertise in the field of basketball, as well as his familiarity with the city of Chicago where he lived and operated A.M. Saperstein Sports Enterprises for many years, was considered by the other ABL team owners as the key to the successful operation of an ABL franchise in Chicago and to the success of the ABL as a whole. With the exception of Los Angeles, San Francisco and, possibly, Chicago, *159 the cities that were granted ABL franchises did not have NBA franchises as well. When Abe Saperstein assumed the Chicago ABL franchise, he fully realized and anticipated that he would probably have to contend with an NBA entry; however, petitioner believed that in a "bare knuckle fight" he would "be able to hold [his] own." On November 17, 1961, petitioner incorporated the Chicago Majors Basketball Club, Inc. (hereinafter Chicago Majors) and became the principal stockholder (99 percent) thereof. The Chicago Majors had a stated capital of $1,000 and was indebted to petitioner in the following amounts as of the dates indicated: Date
Amount of Debt
December 31, 1961
$ 54,766.45
December 31, 1962
182,691.70
Since the Harlem Globetrotters were claimed to be largely responsible for the growth of the NBA, the ABL team owners believed that the Globetrotters, if scheduled on doubleheaders with ABL teams, could help to promote the ABL and its member teams. In an effort to promote the ABL some HGT players were traded or sold to ABL teams. Abe Saperstein assured every team owner in the ABL that he would use the Globetrotters whenever possible and wherever possible *160 in furthering the interests of the American Basketball League. Petitioner's willingness to further the ABL was manifested by the fact that when most of the teams in the ABL had failed to honor their agreements to provide the funds necessary to meet its current operating expenses, he lent it money from time to time in order to defray these expenses. From the date of its inception until its demise as of December 31, 1962, petitioner loaned the ABL a total of $55,903.36. These loans were not evidenced by notes; no maturity dates were set; and no security or interest therefor was received. As of December 31, 1962, the $55,903.36 was uncollectible and the loans were considered worthless by petitioner who deducted said amount on his tax return for the calendar year 1962. The incurrence of this loan and its worthlessness in 1962 have been stipulated by the parties. In addition to the Harlem Globetrotters, the ABL, and his stock ownership in the NBA Philadelphia Warriors and the ABL Chicago Majors, Abe Saperstein was involved over the course of his lifetime in other sports and entertainment activities among which were musical reviews, Negro baseball, an automobile stunt circus, boxing, *161 and other similar entertainment. At one time, petitioner also owned a basketball team called the Kansas City Stars. It is also noteworthy that petitioner was approached by representatives of the iceskating extravaganza, the Ice Capades, who requested him to help expand the operations of the Ice Capades into Hawaii and Australia, which promotion he undertook to perform. The entertainment and sports events which petitioner organized and produced were intended, for the most part, to draw attention to Abe Saperstein and his Globetrotters. Although most of these ventures failed, petitioner succeeded in attaining international renown for himself and his Globetrotters. The Harlem Globetrotters were Abe Saperstein's main source of revenue, and he himself referred to them as his "bread and butter." While the Harlem Globetrotters were an outstanding basketball attraction, particularly during the 1940's and 1950's, the NBA, during the 1950's, was developing a reputation for itself as an outstanding professional basketball league. Abe Saperstein feared that the NBA would supersede the Globetrotters in popularity and reputation. In particular, he feared that if the NBA were to become *162 recognized by the public as "the outstanding form [sic] for basketball and basketball players, this would detract from the reputation of the * * * [HGT] as the number one team." Another very real fear which petitioner entertained was that NBA expansion would jeopardize access of the Globetrotters to major playing sites. 920 As the NBA expanded, petitioner feared that he would encounter some difficulties in obtaining the best Negro players for the Globetrotters. This had not been a serious problem during the earlier formative years of the NBA since the NBA had maintained a policy of refusing to recruit Negro players. However, once this policy was curtailed, the NBA was able to, and did in fact, recruit top Negro basketball players, which situation created grave fears in Abe Saperstein's mind as to his ability to compete for outstanding Negro talent. Petitioner also felt that it was important for the Globetrotters to play teams from the NBA in order to reinforce in the mind of the public that HGT was not just a team known for its clowning antics, but for its basketball prowess. However, the NBA adopted a rule in the early 1950's prohibiting its member teams from competing *163 against the Globetrotters. This policy, although never expressed in writing, was adopted as a result of the fact that the Harlem Globetrotters had played against and defeated the Minneapolis Lakers, an NBA team considered by many as "the greatest basketball team in the world outside of the Harlem Globetrotters." Thereafter, Abe Saperstein felt it was necessary for the Globetrotters to play in major playing sites in major cities, such as Madison Square Garden and Chicago Stadium, and also to play against league teams in order to maintain its status as a super attraction. During this same period in the 1950's and early 1960's, petitioner was also having conflicts with some NBA team owners which led to strained relations. Moreover, during this same period, several Globetrotter players left the Globetrotter organization and formed teams of their own. Goose Tatum and Marquis Haynes were two such players who formed the "Harlem Magicians." The name was devised by borrowing the word "Harlem" from the Harlem Globetrotters and the word "Magicians" from the phrase "Magicians of Basketball," by which title the Globetrotters were known. Following the "falling out" which Abe Saperstein had had *164 with some NBA team owners, some of the arenas to which the HGT had previously been permitted access started to book the Harlem Magicians to the exclusion of the Harlem Globetrotters. This whole situation jeopardized the access which the Globetrotters could acquire to the stadiums controlled by these NBA team owners. Abe Saperstein believed that, with the advent of the NBA, basketball within a competitive league was fast becoming a common thing. The ABL, he hoped, would provide a needed format that would help him to maintain the Globetrotters as the "number one team." Opinion Abe Saperstein, owner of the Harlem Globetrotters, was instrumental in organizing the now-defunct American Basketball League in the early 1960s, during which time he made certain advances of funds to it totaling $55,903.36, in order to continue its successful operation. These loans became worthless during 1962 and petitioner claimed a deduction for them as business bad debts on his income tax return for 1962. Respondent disallowed this deduction, contending that the worthless loans are deductible only to the extent provided in section 166, Internal Revenue Code of 1954, [1] as nonbusiness *165 bad debts. *166 Since respondent disallowed this deduction, the burden rests on petitioner to prove his determination incorrect. Rule 32, Tax Court Rules of Practice.
The parties are not in disagreement with respect to (1) the fact that there was an 921 indebtedness from the ABL to petitioner; (2) the amount of the indebtedness - $55,903.36; or (3) the fact that the debt became worthless in 1962. The sole issue for our determination is whether the bad debt loss incurred by petitioner constituted a business or nonbusiness bad debt. Section 166(d)(2) defines a nonbusiness debt as any debt other than - (A) a debt created or acquired (as the case may be) in connection with a trade or business of the taxpayer; or (B) a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business. The determination of whether the debt is a business or nonbusiness debt is a factual question to be decided in each particular case. Hickerson v. Commissioner, 229 F. 2d 631 (C.A. 2, 1956), affirming a Memorandum Opinion of this Court; section 1.166-5 (b)(2), Income Tax Regs. *167 This same regulation provides that - the character of the debt is to be determined by the relation which the loss resulting from the debt's becoming worthless bears to the trade or business of the taxpayer. If that relation is a proximate one in the conduct of the trade or business in which the taxpayer is engaged at the time the debt becomes worthless, the debt comes within * * *. Therefore, the issue resolves itself to whether the advances in question were proximately related to petitioner's trade or business. As a preliminary matter, we note that it will be unnecessary for us to decide exactly what were the "[trades] or [businesses]" of Abe Saperstein during the period in question, in addition to his admitted business of the Harlem Globetrotters, since we hold herein that the advances were proximately related to Abe Saperstein's Globetrotters. In attempting to sustain his burden of proving that the bad debt losses he incurred were proximately related to his trade or business, Whipple v. Commissioner, 373 U.S. 193 (1963); Spillers v. Commissioner, 407 F. 2d 530 (C.A. 5, 1969), affirming a Memorandum Opinion of this Court; Curry v. United States, 396 F. 2d 630 *168 (C.A. 5, 1968), petitioner advanced three positions: (1) The loans were proximately related to the operation of the Harlem Globetrotters because they would sustain the ABL which, in turn, could be used as a means of supporting, preserving and improving the profitable operation of the Globetrotters. (2) The loans were proximately related to petitioner's intention of preserving his reputation and business as a "sports and entertainment promoter" since the ABL was known to be largely the result of his efforts and any failure by the new basketball circuit would, petitioner believed, affect substantially his reputation. (3) The loans were proximately related to petitioner's business of serving as commissioner of the ABL from which he hoped to reap substantial future salaries. The evidence clearly established that the Harlem Globetrotters organization was petitioner's main source of revenue during his lifetime. Petitioner's witnesses testified that Abe Saperstein, primarily in an effort to provide publicity to the Globetrotters, did engage in organizing and/or producing various types of entertainment or other similar endeavors which he felt could reasonably be expected to attract *169 the public's interest. Although most of these ventures failed, petitioner succeeded in making the Globetrotters internationally known and attained for himself the prestigious title - "Mr. Basketball." Petitioner's first contention is that the advances he made to the ABL were proximately related to his business of the Harlem Globetrotters. The Globetrotters were a proprietorship organization, operated as such by Abe Saperstein through the A.M. Saperstein Sports Enterprises until his death in 1966. It functioned as an independent traveling organization separate and apart from any basketball league, and it was reputed to be "the most sought after athletic organization in the entire world" because of its unique ability to couple basketball prowess with clowning tactics and antics that amused basketball and other sports fans alike. Petitioner argues that it was due to his concern over the future of the HGT that he decided to organize the ABL. He alleges that proposed NBA expansion was a threat to the HGT in that "such an expansion would freeze the Globetrotters off of further key playing sites," and that the ABL would help the HGT by assuring the latter of necessary key playing *170 sites. Petitioner advances two other reasons why the loans to the ABL were proximately related to the Harlem Globetrotters. One, 922 the necessity of maintaining a champion professional basketball league, the teams in which could serve as opponents to the HGT; and two, his concern that he might not always be able to recruit the best Negro players for his Globetrotters because of the competition from the NBA, which, contrary to its earlier policy of excluding Negro players, now recruited top Negro basketball stars. It was intended, petitioner alleges, that the new league serve as a "farm team" from which he could pick and choose players as the needs of the Globetrotters arose. With respect to petitioner's alleged fear of a "freeze-out" regarding playing sites, it is apparent from the record that it was necessary for the Globetrotters to play the large arenas in order to keep themselves "in the national limelight." Since, during the late 1950's and early 1960's, his relations with a few of the NBA team owners had become strained, this situation seriously jeopardized the Globetrotters' access to the stadiums already controlled by these NBA team owners. The NBA also intended *171 to expand into Los Angeles and San Francisco, as well as other major cities and, with this expansion, the possibility of a "freeze-out" in these new areas was ever-present to Abe Saperstein. The Globetrotters did not have any type of agreement with the NBA with respect to playing sites. Arrangements were made with individual NBA teams rather than with the NBA, as an association, whenever the HGT was going to appear in connection with any NBA game. It was of prime importance, therefore, to maintain good working relationships with the NBA team owners. In light of petitioner's strained relations with certain of these team owners, as well as with the NBA, it was important to the Globetrotters that the ABL acquire franchises in major cities so that playing sites would be available to them. As to the contention that the necessity arose to have a professional league, which could compete with the Globetrotters, we note that the HGT, reputed as it was for its basketball skill, could not be anticipated at first to compete against the newly established ABL teams, which needed sufficient time to develop their abilities as outstanding basketball players. Although the Harlem Globetrotters *172 were renowned throughout the world, particularly during the 1940's and 1950's, the NBA began during the 1950's to recruit outstanding Negro stars and to develop a reputation as an outstanding professional basketball league comprised of outstanding teams and players. Abe Saperstein feared that the Globetrotters would be superseded in popularity and reputation by the NBA. In particular, he feared that if the NBA were to become recognized by the public as "the outstanding form for basketball and basketball players, this would detract from the reputation of the Harlem Globetrotters as the number one team." Petitioner felt that it was important for the Globetrotters to play teams from the NBA in order to reinforce in the public's mind that the HGT was not just a team known for its clowning antics, but for its basketball prowess. However, the NBA adopted a policy, although never committed to paper, that prohibited its member teams from competing against the Globetrotters. This policy was adopted as a result of the fact that the Globetrotters had played against and defeated the Minneapolis Lakers, an NBA team which was considered in the early 1950's as "the greatest basketball team in the *173 world outside of the Harlem Globetrotters." Abe Saperstein felt it was essential to play against league teams in order to maintain the status of the Globetrotters as a super attraction. With the advent of the NBA, petitioner, an extremely knowledgeable man in the field of basketball, believed that basketball within the framework of a competitive league was fast becoming a common thing. The ABL, he hoped, would provide a needed format that would eventually compete with the Globetrotters and thereby help him to maintain the HGT as the "number one team." While we accept the fact that petitioner formed the ABL and looked upon it as a source of playing sites and competition for the Harlem Globetrotters, the fact that there was no agreement, whether written or oral, which would permit petitioner to use the ABL teams as a source from which to recruit players for the HGT, militates against our accepting petitioner's assertion that the ABL was intended to serve as a "farm team" from which he could pick and choose players for the Globetrotter team. We cannot bring ourselves to accept, on the evidence presented, that the ABL team owners, despite their admiration, respect and friendship for *174 Abe Saperstein, would 923 necessarily relinquish players to his Globetrotter organization at a time when the ABL needed the most outstanding players it could find to enable it to become a successful, competitive basketball league. Nor can we believe that Abe Saperstein seriously entertained such an idea. Despite the fact that we do not believe that petitioner seriously entertained the idea of using the ABL as a sort of "farm team" for his Globetrotters, we hold that the loans which petitioner made to the ABL were proximately related to the business of the Harlem Globetrotters. With respect to the question of proximate relation under the rule recently set forth in Jack E. Golsen, 54 T.C. 742 (1970), our decision must be based on the test enunciated by the Court of Appeals for the Seventh Circuit, within which Circuit this case arise. In Niblock v. Commissioner, 417 F. 2d 1185 (C.A. 7, 1969), affirming a Memorandum Opinion of this Court, the Seventh Circuit held squarely that section 166 demands the application of the primary motivation, rather than the significant *175 motivation, in attempting to determine whether loans are proximately related to a taxpayer's trade or business. The court said: In order for taxpayer to obtain a deduction for a business bad debt, he must prove that his corporate employment furnished the dominant and primary motivation for making the advances and the guarantees. We disagree with the significant motivating factor test that was applied by the majority in * * * [2] We believe that the only test that will inject sufficient certainty into the interpretation of Section 166, supra, is the dominant and primary motivation test that we have stated. * * *, Petitioner harbored fears that the Globetrotters would no longer have access to key playing sites in view of the plans for expansion of the NBA and in view of his strained relationships with some of the NBA team owners. He believed that the ABL would insure the Globetrotters' access to major playing sites, thereby maintaining the Globetrotters "in the national limelight." Abe Saperstein also wanted a successful new league, such as the ABL, which could serve as a source of competition for his Harlem *176 Globetrotters. Playing and defeating professional league teams would, petitioner believed, reinforce in the mind of the public that the Globetrotters were the "number one" basketball team. It was these fears which primarily or dominantly motivated petitioner to form the ABL and make advances to sustain it. Accordingly, the debt arising therefrom is a business bad debt. Niblock v. Commissioner, supra. See S. E. Maitland Brenhouse, 37 T.C. 326 (1961); J. T. Dorminey, 26 T.C. 940 (1956). Cf. Stuart Bart, 21 T.C. 880 (1954). Respondent asserts on brief that petitioner's primary or main motivation in advancing funds to the ABL was to protect his investment in the Chicago Majors. While it is true that Abe Saperstein had invested in this ABL team, the facts surrounding his assumption of the Chicago Majors' franchise belie respondent's contention. Abe Saperstein had been interested in obtaining an ABL San Francisco franchise. It was only upon the advice of legal counsel that petitioner decided instead to "move into the Chicago 'picture,'" where opposition from a newly established NBA team was anticipated. Petitioner did not particularly *177 want the Chicago Majors, but assumed ownership thereof to accommodate the ABL and the seven other team owners. In view of our holding as to petitioner's first assertion, we need not pass on the validity of the other two contentions he advanced in support of his position that the loans in question constituted a business bad debt. In order to reflect the concessions made by petitioner and the conclusions reached herein, Decision will be entered under Rule 50. 924 Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated. Section 166 provides in pertinent part as follows: SEC. 166. BAD DEBTS. (a) General Rule - (1) Wholly worthless debts. - There shall be allowed as a deduction any debt which becomes worthless within the taxable year. * * * (d) Nonbusiness Debts. - (1) General rule. - In the case of a taxpayer other than a corporation - * * * (B) where any nonbusiness debt becomes worthless within the taxable year, the loss resulting therefrom shall be considered a loss from the sale or exchange, during the taxable year, of a capital asset held for not more than 6 months. (2) Nonbusiness debt defined. - For purposes of paragraph (1), the term "nonbusiness debt" means a debt other than - (A) a debt created or acquired (as the case may be) in connection with a trade or business of the taxpayer; or (B) a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business.↩
2. Weddle v. Commissioner, 325 F. 2d 849↩ (C.A. 2, 1963).