Mance T. SPILLERS and Mary J. Spillers,
Petitioners,

v.

COMMISSIONER OF INTERNAL REV-
ENUE, Respondent.

No. 26092.

United States Court of Appeals
Fifth Circuit.

Feb. 21, 1969.

E. Jackson Boggs, Albert C. O'Neill, Jr., of Fowler, White, Collins, Gillen, Humkey & Trenam, Tampa, Fla., for petitioners.

Mitchell Rogovin, Asst. Atty. Gen., Dept. of Justice, Lee A. Jackson, Atty., Dept. of Justice, Tax Div., Robert N. Anderson, Chester C. Davenport, Attys., Dept. of Justice, Lester R. Uretz, Chief Counsel, I.R.S., Washington, D. C., for respondent.

Before THORNBERRY and DYER, Circuit Judges, and KEADY, District Judge.

DYER, Circuit Judge:

This is a petition to review, pursuant to Section 7482 of the Internal Revenue Code of 1954, a decision by the Tax Court assessing income tax liabilities against the taxpayers Mance T. Spillers and Mary J. Spillers. They sought a redetermination in the Tax Court of asserted deficiencies in income tax for the years 1958, 1959 and 1961, claiming that a $50,000 loss suffered by them as owners of stock in a corporation which had become bankrupt should be treated as an ordinary (rather than capital) loss, pursuant to the provisions of Section 1244 of the Internal Revenue Code of 1954. Mance Spillers further claimed that $12,-500 paid by him as the guarantor of two notes given by a corporation of which he was a major stockholder, qualified as a business bad debt and was deductible in full from ordinary income under Section 166 of the Code. The Tax Court found against the petitioners.[1] We affirm.

The facts are undisputed and uncomplicated. Mance Spillers owned an unincorporated business known as Spillers Home Builders.[2] To obtain financing, it was decided that Home Builders should incorporate and go public. Spillers Home Builders, Inc.,[3] was organized on December 13, 1958, with an authorized capital of 1,000,000 shares of $1.00 par value common stock. Spillers thereafter had second thoughts about going public, so the corporation issued no stock, received no assets, and did no business.

On October 2, 1959, a new plan was formulated to obtain financing under which the assets of Home Builders, which had a determined fair market value of $218,085.00, were transferred to

---

1. Spillers v. Commissioner, 26 T.C.M. 1069 (1967).

2. For convenience referred to as Home Builders.

3. For convenience referred to as Spillers Corporation.

Spillers Corporation in return for 111,043 shares of its stock issued to Mance Spillers and 107,042 shares of its stock issued to Mary J. Spillers. Various other investors paid $1.00 per share for 164,000 shares of Spillers Corporation stock, leaving Spillers Corporation with 617,915 shares of authorized but unissued stock at $1.00 per share. The plan made no provision for a date beyond which stock could not be issued, but no other stock was in fact ever issued after October 2, 1959. On the same date, the stockholders entered into a preemptive stock purchase agreement, under which one stockholder was guaranteed by the other stockholders the right to obtain a pro rata share of any stock issued in the future.

In 1961 Spillers Corporation became bankrupt, the petitioners' stock became worthless, and they contend that $50,000 of the loss they suffered should be treated as an ordinary loss under section 1244 of the Code.

Generally speaking, a loss incurred when capital stock becomes worthless is a capital loss, the deductibility of which is limited to capital gains plus $1,000 of ordinary income.[4] As an exception to this general rule, if the stock qualifies as § 1244 stock and becomes worthless, certain losses may be deductible as an ordinary loss.[5] The Code defines § 1244 stock in plain terms as stock issued by a domestic corporation under a plan adopted after June 30, 1958, to offer such stock for a period specified in the plan, ending not later than two years after the date the plan was adopted, and further that at the time such plan was adopted the corporation must be a "small business corporation." A corporation qualifies as a small business corporation if, among other things, at the time of the adoption of the plan, the aggregate amount which may be offered under the plan does not exceed $500,000.[6] We hold that the taxpayers' worthless stock in Spillers Cor-

---

4. See §§ 165(g), 1211(b), 1221 and 1222 of the Internal Revenue Code of 1954.

5. § 1244. Losses on small business stock

(a) *General rule.*—In the case of an individual, a loss on section 1244 stock issued to such individual or to a partnership which would (but for this section) be treated as a loss from the sale or exchange of a capital asset shall, to the extent provided in this section, be treated as a loss from the sale or exchange of an asset which is not a capital asset.

(b) Maximum amount for any taxable year.—For any taxable year the aggregate amount treated by the taxpayer by reason of this section as a loss from the sale or exchange of an asset which is not a capital asset shall not exceed—

(1) $25,000, or

(2) $50,000, in the case of a husband and wife filing a joint return for such year under section 6013.

The Spillers filed joint returns for the years in question.

6. Section 1244 reads in pertinent part:

\* \* \* \* \*

(c) *Section 1244 Stock Defined.*—

(1) *In General.*—For purposes of this section, the term "section 1244 stock" means common stock in a domestic corporation if—

(A) such corporation adopted a plan after June 30, 1958, to offer such stock for a period (ending not later than two years after the date such plan was adopted) specified in the plan,

(B) at the time such plan was adopted, such corporation was a small business corporation,

\* \* \* \* \*

(2) *Small Business Corporation Defined.*—For purposes of this section, a corporation shall be treated as a small business corporation if at the time of the adoption of the plan—

(A) the sum of—

(i) the aggregate amount which may be offered under the plan, plus

(ii) the aggregate amount of money and other property (taken into account in an amount, as of the time received by the corporation equal to the adjusted basis to the corporation of such property for determining gain, reduced by any liabilities to which the property was subject or which were assumed by the corporation at such time) received by the corporation

poration does not meet the statutory definitional requirements of Section 1244 stock.

The main thrust of taxpayers' argument is that the corporate resolutions of October 2, 1969, and its "Stock Voting and Business Management Agreement" (preemptive agreement) evidenced a plan to immediately issue stock for the total sum of $382,085, thereby meeting both the time and amount requirements of § 1244.

■ While we agree with the taxpayers that the corporate resolutions were "a sufficient writing to meet the requirements of the statute," Eger v. C. I. R., 2 Cir.1968, 393 F.2d 243, 246, the difficulty is that they made no mention of the period in which the stock was to be offered, nor limit the maximum dollar amount of stock which could be offered, which under the Spillers Corporation charter remained at one million shares of $1 par value common stock.

■ The pre-emption agreement did no more than provide that the authorized but unissued shares could not be offered or issued, and no additional shares authorized absent the consent of the largest minority shareholder, and then only subject to its preemptive rights, unless waived, to purchase a certain percentage of such shares. Obviously this did not prohibit the offering or issuance of previously authorized shares, up to one million, nor the authorization of additional shares.

Leaning heavily on Eger the taxpayers loosely state that "where corporate minutes set forth a plan for the immediate issue of specified shares of stock for a specified amount of money less than $500,000.00, it is not necessary to add the superfluous and formal statements that such issuance must be completed within two years and that the considera-

tion to be received must not exceed $500,000.00." If we put our imprimatur on what the taxpayers characterize as superfluous we would effectively repeal the requirements for § 1244 stock. Eger is readily distinguishable. There the taxpayer was the sole stockholder who paid $40,000 for her 40 shares (the total authorized capital) pursuant to a corporate motion and resolution that the stock was issued pursuant to § 1244. The court found that "the very formation of the corporation and issue of its stock was expressed to be in conformity with and limited to the conditions required by section 1244, the amount and period of time actually involved were within the statutory limitations, and the contemplated loss occurred. Id at 246. Commenting on the Tax Court decision in this case the Eger opinion particularly pointed out,

In Spillers there was no reference to sec. 1244 in the corporate minutes concerning the purchase of stock, and a stock voting agreement of the same date contemplated possible future issues, uncertain in time and amount. Id at 247.

■ Finally the taxpayers, with ingenious casuistry, begin with a sound premise that a corporation may withdraw one plan and adopt a new plan to issue stock, the original and each subsequent plan to be tested by the requirements of § 1244.[7] Then they say that should economic conditions require additional capital, stock over the initial amount of $382,085.00 could be issued *pursuant to a new plan.* It follows, therefore, they submit, that the requirements of § 1244 as to duration and amount were met with respect "to the [original] sale plan and issuance of stock in this case, namely that on October 2, 1959." This is a specious syllogism. The fact that new plans may be

after June 30, 1958, for stock, as a contribution to capital, and as paid in surplus, does not exceed $500,000; * * * * * * * * *

7. Reg. §§ 1.1244(c) 1(h) (1) and 1(h) (2).

formulated from time to time that comply with § 1244 requirements proves nothing with respect to the validity under § 1244 of the original plan. The statutory definitional requirements of a plan must be shown to exist at the time the plan is adopted and the stock is issued, and if they are not *then* met the stock offered does not qualify for § 1244 treatment.

The Tax Court correctly held that the worthless stock did not meet the requirements of § 1244 and the taxpayers were therefore not entitled to the ordinary loss deduction permitted by that section.

We turn now to the contention of petitioner Mance Spillers that the amounts paid by him as a guarantor of corporate notes were losses deductible as business bad debts.

On February 12, 1959, Spillers endorsed a note of even date in the amount of $24,000 made by S & S Fullform Tops, Inc. On September 2, 1959, Spillers endorsed an additional note in the amount of $10,000 also made by S & S. The lender, Marine Bank & Trust Company, required Spillers, the owner and operator of Home Builders, unincorporated, to endorse these notes as a condition of its loans to S & S. During this time Spillers was a major stockholder of S & S. On December 7, 1961, at a time when S & S was bankrupt, Spillers was forced to pay to the bank $12,500, the unpaid balance of the S & S notes. Spillers contended that the losses so incurred were deductible as business bad debts under Section 166 of the 1954 Code.[8] The Tax Court sustained the Commissioner's determination to the contrary. We agree.

■ The burden was on Spillers to show that he sustained bad debt losses which were proximately related to his Home Builders' business. Whipple v. Commissioner of Internal Revenue, 1963, 373 U.S. 193, 83 S.Ct. 1168, 10 L. Ed.2d 288; Curry v. United States, 5 Cir.1968, 396 F.2d 630; Kelly v. Patterson, 5 Cir.1964, 331 F.2d 753; Weddle v. C. I. R., 2 Cir.1963, 325 F.2d 849; United States v. Byck, 5 Cir.1963, 325 F.2d 551. In an attempt to discharge this burden Spillers makes a three pronged assertion that the notes were endorsed by him (1) to secure a dependable source of supply from S & S for Home Builders; (2) to protect Spillers' reputation in the home building business; and (3) because S & S was a lessee of a building owned by Home Builders. We will examine these seriatim.

■ The difficulty with Spillers' assertion that he needed to secure a dependable source of supply for Home Builders is that it is not supported by the record. Dorminey v. Commissioner,

8. SEC. 166 [As amended by Sec. 8, Technical Amendments Act of 1958, P.L. 85–866, 72 Stat. 1606]. BAD DEBTS.
   (a) *General Rule.*—
   (1) *Wholly worthless debts.*—There shall be allowed as a deduction any debt which becomes worthless within the taxable year.
   (2) *Partially worthless debts.*—When satisfied that a debt is recoverable only in part, the Secretary or his delegate may allow such debt, in an amount not in excess of the part charged off within the taxable year, as a deduction.
   *       *       *       *       *
   (d) *Nonbusiness Debts.*—
   (1) *General rule.*—In the case of a taxpayer other than a corporation—
   (A) subsections (a) and (c) shall not apply to any nonbusiness debt; and

(B) where any nonbusiness debt becomes worthless within the taxable year, the loss resulting therefrom shall be considered a loss from the sale or exchange, during the taxable year, of a capital asset held for not more than 6 months.
   (2) *Nonbusiness debt defined.*—For purposes of paragraph (1), the term "nonbusiness debt" means a debt other than—
   (A) a debt created or acquired (as the case may be) in connection with a trade or business of the taxpayer; or
   (B) a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business.
   *       *       *       *       *

26 T.C. 940 (1956) and Levine v. Commissioner, 31 T.C. 1121 (1959), in each of which a necessity was shown, are inapposite. Spillers emphasizes that Home Builders purchased all of its requirements in the line of items manufactured by S & S from that corporation, but there is no showing that such supplies were in high demand or difficult to obtain from other sources. Actually S & S was a relatively minor supplier of Home Builders. The percentage of purchases from S & S in relation to the total purchases of Home Builders was approximately 5 percent in 1958 and 7 percent in 1959. There is simply no showing that Home Builders received any special benefit because of Spillers' endorsement of the S & S notes.

 Spillers next contends that his endorsement of the notes were business related because of the necessity to preserve his reputation and credit in the home building industry. Spillers so testified. There was no proof, however, that the customers of S & S were also customers of Home Builders or any showing that Home Builders or Spillers would in any wise be affected by the demise of S & S. Under these circumstances the Tax Court was the sole judge of the credibility of Spillers and the weight to be accorded to his testimony. Teitelbaum v. Commissioner of Internal Revenue, 7 Cir.1965, 346 F.2d 266; Rule 52(a) Fed.R.Civ.P. See Estate of Broadhead v. C. I. R., 5 Cir.1968, 391 F.2d 841.

Finally, a proximate relationship between the losses incurred and Spillers' Home Builders business is sought to be predicated upon his claim that he guaranteed $34,000 of notes of S & S to keep it in business so that S & S would continue as a tenant of Home Builders and receive the leasehold monthly rental of $300. In 1959, instead of the payment of $3600 in rental, Home Builders received $1,074.68. The record is silent concerning the lack of availability of other tenants at the same or greater rental. We agree with what the Tax Court had to say in disposing of this bit of hyperbole: "What is surprising is that petitioner now attempts to argue that his motive in guaranteeing the notes was to preserve S & S as a tenant, when the tenant was unable to pay its rent." Spillers v. Commissioner, 26 T. C.M. 1069, 1077 n. 8.

Applying, as we must, the "unless clearly erroneous" rule of F.R.Civ.P. 52(a) applicable to review of decisions of the Tax Court by § 7482(a) of the Code, Whipple v. Commissioner, supra; Estate of Broadhead v. C. I. R., supra; Weddle v. C. I. R., supra; Hirsch v. C. I. R., 9 Cir.1963, 315 F.2d 731; Young v. C. I. R., 9 Cir.1959, 268 F.2d 245, we conclude that the holding of the Tax Court was not clearly erroneous; it was clearly warranted.

Affirmed.