**Pierre GODART and Suzanne Godart, Appellants,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Appellee.**

**No. 383, Docket 33950.**

United States Court of Appeals, Second Circuit.

Argued Jan. 5, 1970.

Decided Feb. 16, 1970.

Norman Nadel, New York City (Benjamin Nadel, New York City, of counsel), for appellants.

Kenneth L. Gross, Atty., Dept. of Justice, Washington, D. C. (Johnnie M. Walters, Asst. Atty. Gen., Lee A. Jackson and Harry Baum, Attys., Dept. of Justice, Washington, D. C., of counsel), for appellee.

Before LUMBARD, Chief Judge, FRIENDLY, Circuit Judge, and JUDD, District Judge.*

FRIENDLY, Circuit Judge:

This petition to review a decision of the Tax Court raises a close question concerning the interpretation of § 1244 of the Internal Revenue Code of 1954, which provides that up to certain maxima, a loss on "§ 1244 stock" is deductible as an ordinary rather than a capital loss. The sole issue is whether certain of the taxpayers' stock satisfied the requirements of § 1244(c) [1] and the Commissioner's regulations thereunder.[2]

---

* Of the Eastern District of New York, sitting by designation.

1. (c) Section 1244 stock defined.—

(1) In general.—For purposes of this section, the term "section 1244 stock" means common stock in a domestic corporation if—

(A) such corporation adopted a plan after June 30, 1958, to offer such stock for a period (ending not later than two years after the date such plan was adopted) specified in the plan,

(B) at the time such plan was adopted, such corporation was a small business corporation,

(C) at the time such plan was adopted, no portion of a prior offering was outstanding,

(D) such stock was issued by such corporation, pursuant to such plan, for money or other property (other than stock and securities), and

(E) such corporation, during the period of its 5 most recent taxable years ending before the date the loss on such stock is sustained (or if such corporation has not been in existence for 5 taxable years ending before such date, during the period of its taxable years ending before such date, or if such corporation has not been in existence for one taxable year ending before such

date, during the period such corporation has been in existence before such date), derived more than 50 percent of its aggregate gross receipts from sources other than royalties, rents, dividends, interest, annuities, and sales or exchanges of stock or securities (gross receipts from such sales or exchanges being taken into account for purposes of this subparagraph only to the extent of gains therefrom); except that this subparagraph shall not apply with respect to any corporation if, for the period referred to, the amount of the deductions allowed by this chapter (other than by sections 172, 242, 243, 244, and 245) exceed the amount of gross income.

Such term does not include stock if issued (pursuant to the plan referred to in subparagraph (A)) after a subsequent offering of stock has been made by the corporation.

(2) Small business corporation defined.—For purposes of this section, a corporation shall be treated as a small business corporation if at the time of the adoption of the plan—

(A) the sum of—

(i) the aggregate amount which may be offered under the plan, plus

On October 25, 1960 the taxpayer, Pierre Godart, TSM Corporation of which he was president and sole stockholder, and S. Stroock & Co., Inc. entered into a Lease and License Agreement. This provided that they would organize a New York company, with a certificate of incorporation substantially in a form attached, and would cause it "on or prior to the date of closing" to issue 1250 shares for $125,000 to Stroock and 2500 shares for $250,000 to Godart and TSM, which the parties agreed to purchase. No stock other than three directors' qualifying shares was to be issued prior to the closing date, but the Agreement was silent about issuances on that date. The new company was to take over the woolen weaving business of Stroock and to sell notes in specified amounts to Stroock and to Rusch & Co., a commercial banker and factor. Stroock agreed to proceed as promptly as practicable to hold a stockholders' meeting to obtain all needed authorization. The closing was to "take place as soon as practicable, but in any event not later than the first day of the first month after the approval by the stockholders of Stroock of the transactions contemplated." At the closing the notes and any of the 3750 shares of stock which remained unissued were to be issued and paid for, and certain other transactions were to be carried out.

The parties proceeded to incorporate The French-American-British Woolens Corporation (FAB) with authorized capital stock of $1,000,000 consisting of 10,000 shares of common stock of a par value of $100. On December 22, 1960, the Stroock stockholders granted approval. Eight days later the directors of FAB held their first meeting. Resolutions were adopted authorizing the issuance of 1250 shares of common stock to Stroock, 1500 to TSM, and 1000 to Godart, at $100 per share; the officers were authorized and directed to issue the stock on the acceptance of such offers and payment in cash. The chairman presented to the meeting the Lease and License Agreement together with all its exhibits and schedules. The directors then approved various transactions therein contemplated, including the Main Lease from Stroock, a Store Lease, a License Agreement, an assumption of the

---

(ii) the aggregate amount of money and other property (taken into account in an amount, as of the time received by the corporation, equal to the adjusted basis to the corporation of such property for determining gain, reduced by any liabilities to which the property was subject or which were assumed by the corporation at such time) received by the corporation after June 30, 1958, for stock, as a contribution to capital, and as paid-in surplus,
does not exceed $500,000; and
(B) the sum of
(i) the aggregate amount which may be offered under the plan, plus
(ii) the equity capital of the corporation (determined on the date of the adoption of the plan),
does not exceed $1,000,000.
For purposes of subparagraph (B), the equity capital of a corporation is the sum of its money and other property (in an amount equal to the adjusted basis of such property for determining gain), less the amount of its indebtedness (other than indebtedness to shareholders).

2. Regulations § 1.1244(c)–1(c)(1):
The common stock must be issued pursuant to a written plan adopted by the corporation after June 30, 1958, to offer only such stock during a period specified in the plan ending not later than two years after the date the plan is adopted. The two-year requirement referred to in the preceding sentence will be met if the period specified in the plan is based upon the date when, under the rules or regulations of a Government agency relating to the issuance of the stock, the stock may lawfully be sold, and it is clear that such period will end, and in fact it does end, within two years after the plan is adopted. The plan must specifically state, in terms of dollars, the maximum amount to be received by the corporation in consideration for the stock to be issued pursuant thereto. See § 1.1244(c)–2 for the limitation on the amount that may be received by the corporation under the plan. For purposes of section 1244, an increase in the basis of outstanding stock as a result of a contribution to capital is not an issuance of stock.

Stroock Pension Plan and an implementing Trust Agreement so that its benefits would continue to be available to employees of Stroock when they became employees of FAB or its affiliates, and an assumption of a collective bargaining agreement between Stroock and the Textile Workers Union and a related pension agreement. After the FAB directors' meeting ended, the closing under the Lease and License Agreement began. It was completed early in the afternoon of December 30, 1960.

FAB sustained heavy losses in 1961 and still heavier ones in the early months of 1962, and Godart's stock concededly became worthless during the latter year. The Godarts' joint return for 1962 showed this loss as a long-term capital loss, but after the Commissioner made other adjustments and determined a deficiency, they contended that the stock was § 1244 stock and that they were entitled to an ordinary loss deduction to the extent of $50,000. The Commissioner disagreed, the Tax Court sustained him, 51 T.C. 937, and this petition for review followed. Although we consider the case much closer than did the Tax Court and find some of its discussion open to serious question, we affirm the judgment.

The Tax Court assumed *arguendo* that if the Lease and License Agreement and the corporate minutes, read together, contained all the elements of a "plan" required by § 1244(c), that would satisfy the requirement in Regulations § 1.-1244(c)–1(c) (1) that the plan be written. Nevertheless, it found the "plan" deficient in two fundamental respects. First, it did not specify a time within which the stock would be offered, since the term "closing date" was not understandable without further explanation and reference to outside events. Second, the plan did not specifically state the maximum amount to be received by the corporation in consideration for the stock to be issued pursuant thereto, since in addition to the $375,000 of stock mentioned in the alleged plan the corporation could have issued the remaining

6250 authorized shares on the date of closing. The Tax Court found that the stock failed to qualify under § 1244(c) in other respects, but these were largely dependent on the correctness of the above conclusions.

Counsel for Godart strenuously disputes both these conclusions. The first step for the argument is supplied by our decision in Eger v. C.I.R., 393 F.2d 243, 246 (1968), that corporate minutes may be a sufficient writing to meet the statutory requirements for a plan. The FAB directors' minutes of December 30, 1960, when read with the Lease and License Agreement to which they refer, are claimed to contain the essentials. The requirement that the offering shall be "during a period specified in the plan ending not later than two years after the date the plan is adopted," is allegedly met by the provision in the Lease and License Agreement that the closing shall take place not later than the first day of the first month after approval by Stroock stockholders. A fair reading of the minutes, it is argued, shows that this had already been given, and the closing thus had to occur by January 1, 1961—two days after the plan rather than the two years the statute permits.

The requirement that the plan set a limit on the maximum to be received for the stock to be issued thereunder is claimed likewise to have been satisfied. The only issuance of stock contemplated by the plan was the 3750 shares. for which an amount. was specified. While conceding that nothing in the plan prevented the corporation from issuing additional stock on the date of closing, counsel asserts that such stock would not be issued "pursuant to the plan," and the only consequence of issuance would be that the stock so issued and any stock subsequently issued pursuant to the plan would not qualify under § 1244(c). See Regulations § 1.1244(c)–1(h). He points out that any provision in the plan purporting to limit other stock issuances during the period of the plan would be mere verbiage, since the corporation could always abrogate it, and argues

that the Regulations ought not to be read to require such a useless act.

These arguments have much weight in the abstract but, so far as we can see, their acceptance without more would mean that the first $500,000 of common stock in any new corporation would qualify for ordinary loss treatment, provided only that the initial issue or issues were kept below that figure and one could spell out from the minutes and documents mentioned in them that the stock was to be issued within two years. While the statute is poorly drafted,[3] and it may well be that by careful tax planning any new corporation could achieve § 1244 status for its initial stock issuance, we find no indication in the statute or the legislative history, see H.R. Rep. No. 2198, 85th Cong., 1st Sess., reprinted in 1959–2 Cum.Bull. 709,[4] that any such consequences were intended or foreseen. Rather the House Report stressed that budgetary considerations required that any tax reductions accorded small businesses be kept at a minimum and that other desirable reforms be postponed. *Id.* at 710.

It is not easy to reconcile the potentially broad language of the section with the limited effect Congress envisioned, but a clue is given by the stated purpose of this portion of the bill: "to increase the volume of outside funds which will be made available for the financing of small business" by according ordinary loss treatment to "investments in small business which do not prove to be successful." *Id.* While one could not sus-

tain the position that Congress meant the benefits of § 1244 to be given only to taxpayers who would not have invested without the promise of them, it is hard to see how its purpose would be served by according its benefits in cases where there is no indication that at the time the alleged plan was adopted the corporation had any awareness of the section or any intent to make its extraordinary tax advantages available to investors in the corporation.

The cases seem to reflect this view. In upholding the taxpayer in Eger v. C. I.R., *supra*, 393 F.2d at 246, we stressed that "the very formation of the corporation and issue of its stock was expressed to be in conformity with and limited to the conditions required by section 1244 * * *," and we distinguished four Tax Court decisions denying ordinary loss treatment, relied on by the Commissioner, in large part on the basis of lack of reference to § 1244 in the minutes. *Id.* at 246–247. In Childs v. C.I.R., 408 F.2d 531, 533 (3 Cir. 1969), the court stressed the absence of any reference to the section in the corporate minutes. See also Spillers v. C.I.R., 407 F.2d 530 (5 Cir. 1969).

■■ It is true enough that tax consequences generally depend on what people do and not on what they say. But Congress, if it chooses, may condition tax incentives *both* on doing certain things *and* on showing in an objective way that they were done with an intention of realizing the benefits Congress had afforded.[5] We do not mean either

---

3. *Cf.* H.R.Rep.No.2198, 85th Cong., 1st Sess. (1958), reprinted in 1959–2 Cum. Bull. 709, 727 (minority views of Rep. Curtis) :

    I have endeavored unsuccessfully to learn where this suggestion came from. I doubt if it came from the small-business groups. I think probably it originated in the mind of some wealthy father-in-law who saw a way of getting a tax credit for the losses he was experiencing in his son-in-law's enterprises.

4. After the bill, H.R. 13382, had passed the House, the Senate combined it with

H.R. 8381, the Technical Amendments Act of 1958. There is thus no Senate Report that casts any illumination.

5. Much the same purpose appears to lie behind the requirements in Regulations § 1.1244(e)–1 that both corporation and shareholder keep certain records to substantiate a claimed deduction under § 1244. Such requirements also avoid the expenditure of administrative and judicial time that would be required if taxpayers who had no idea of meeting the simple requirements of § 1244 were free to try to bring themselves under it if their corporation went sour. Whether

that ritualistic reference to § 1244 is essential or that such a reference will save a plan that does not meet the statutory tests. We do mean that there must be some substantially contemporary objective evidence that the plan was adopted with § 1244 in view. Such evidence is wholly lacking here. Indeed, the taxpayer was still unaware of § 1244 when he filed his return.

The petition to review is denied and the judgment of the Tax Court is affirmed.

these requirements were met in this case was not litigated or decided. Although the Commissioner made no point of this, it seems clear that the requirement of subdivision (e)–1(b) concerning the statement to be made along with the income tax return was not met.