Benjamin **CLAYTEN** and Leah F. Clayten, his wife

v.

**UNITED STATES of America.**

**Civ. No. T–74–1201.**

United States District Court, D. Maryland.

Dec. 19, 1977.

David L. Bowers, Baltimore, Md., for plaintiffs.

Jervis S. Finney, U.S. Atty., Gerard P. Martin, Asst. U.S. Atty., Baltimore, Md., and Thomas M. Lawler, Atty., Tax Div., Dept. of Justice, Washington, D.C., for defendant.

THOMSEN, Senior District Judge.

In this civil action, tried to the court without a jury, Benjamin Clayten (Clayten) and his wife seek a refund of federal income tax and interest in the total amount of $33,781.91 paid for the year 1964, and a refund of such tax and interest in the total amount of $298.22 paid for 1967.

The principal question presented is whether the stock of Inn, Inc. (Inn), owned by Clayten, qualified as stock issued under a plan adopted in accordance with § 1244 of the Internal Revenue Code of 1954 (the Code), 26 U.S.C. § 1244. If the stock so qualified, plaintiffs would be entitled to an ordinary loss deduction in the amount of $50,000 (rather than a capital loss deduction) when the stock became worthless in 1967.

*The Statute and Regulations*

Generally, a loss incurred upon the sale of corporate stock (a capital asset) or upon such stock becoming worthless constitutes a capital loss, the deductibility of which is limited to the capital gains for the year in which the loss is incurred, plus $1,000 of ordinary income. See §§ 165(g), 1211(b), 1221 and 1222 of the Code. Section 1244 of the Code provides an exception to this rule. That section allows certain losses from the sale or worthlessness of stock to be treated as an ordinary loss if the stock qualifies as "Section 1244 stock" as defined in § 1244(c)(1) of the Code.

The portions of § 1244 material to this case are:

(a) *General Rule.*—In the case of an individual, a loss on section 1244 stock issued to such individual or to a partnership which would (but for this section) be treated as a loss from the sale or exchange of a capital asset shall, to the extent provided in this section, be treated as a loss from the sale or exchange of an asset which is not a capital asset.

\*   \*   \*   \*   \*   \*

(c) *Section 1244 Stock Defined.*—

(1) General—For purposes of this section, the term "section 1244 stock" means common stock in a domestic corporation if—

(A) such corporation adopted a plan after June 30, 1958, to offer such stock for a period (ending not later than two years after the date such plan was adopted) specified in the plan,

(B) at the time such plan was adopted, such corporation was a small business corporation,

(C) at the time such plan was adopted, no portion of a prior offering was outstanding,

(D) such stock was issued by such corporation, pursuant to such plan, for money or other property (other than stock and securities), and

(E) * * *

Such term does not include stock if issued (pursuant to the plan referred to in subparagraph (A)) after a subsequent offering of stock has been made by the corporation.

(2) *Small business corporation defined.* —[It is conceded that Inn, Inc., was a "small business corporation", as defined in this subsection.]

* * * * * *

(e) *Regulations.*—The Secretary or his delegate shall prescribe such regulations as may be necessary to carry out the purposes of this section.

Treasury Regulation § 1.1244(c)–1(c)(1) specifies that such a plan must be in writing and must "specifically state, in terms of dollars, the maximum amount to be received by the corporation in consideration for the stock issued pursuant thereto." [1]

The courts have enforced these regulatory requirements in determining the qualifications of a plan for purposes of § 1244. [2]

### Facts

*Finding 1.* In November 1965, Clayten learned that the Alexander Hotel in Hagerstown, Maryland, then owned by Jefferson Standard Life Insurance Company (Jefferson), was for sale. On December 15, 1965, he signed an offer to purchase the hotel for $285,000, which was accepted by Jefferson; Clayten paid $15,000 as "earnest money", and it was agreed that settlement would be made on or before January 14, 1966, at which time an additional $20,000 cash would be paid (subject to adjustment for taxes, etc.), Jefferson would execute a deed for the property to Clayten or his assignee or designee, and would receive a 15-year mortgage from the grantee for the $250,000 balance of the purchase price.

It was contemplated at first that another man would join with Clayten in the purchase of the hotel, but after various events not material in this case, the other man dropped out of the picture, and Clayten caused Inn to be incorporated in Maryland in order to take title to, own and operate the hotel.

On January 10, 1966, Clayten advanced $30,000 to Inn, by means of a check drawn on Clayten's personal bank account and marked "Loan to open checking account for Inn, Inc." The settlement with Jefferson was held on January 13, 1966; Inn, using the proceeds of Clayten's check, paid the $20,000 balance of the down payment and an additional $7,353.03 for various adjustments.

On January 14, 1966, Inn took physical possession of the hotel. That evening, Clayten, his wife and daughter, who were the three directors of Inn, held the first meeting of Inn's Board of Directors. H. David Gann, an attorney employed by Clayten, was also present. Two documents were offered in evidence to show what transpired at that meeting. One was a set of minutes, signed by all three directors on a printed form used by Gann, with some blanks filled in by typewriting and some by pen and ink. Gann testified that the typing was done at his office the following Monday from notes he made at the meeting, and that the signatures and other written material were added promptly thereafter. The document was preserved in the minute book of the corporation. The other document was a thermofax copy of what purported to be Gann's notes taken at the January 14 meeting on an identical printed form. The two documents are essentially similar except for one page (5.2) headed "Plan to Issue Section 1244 Stock". The printed form of that page contained five blanks—

---

1. This requirement stems from a statement in the House Committee Report that "the stock must have been issued pursuant to a plan to offer not more than a stated dollar amount of stock during a period * * * specified in the plan. H.Rep.No. 2198, 85th Cong., 2nd Sess., pp. 8–9 (1959–2 Cum.Bull. 709, 714).

2. *Spillers v. Commissioner,* 407 F.2d 530, 533 (5 Cir. 1969); *Godart v. Commissioner,* 51 T.C. 937, 943–44 (1969), aff'd 425 F.2d 633 (2 Cir. 1970); *Farr v. Commissioner,* 32 T.C.M. 1366, 1369 (1973); *McClanahan v. United States,* 75–1 U.S.T.C., par. 9140 (W.D.La.1974).

In Paragraph 1, a blank for insertion of the date the plan should become effective: on the signed form the date was left blank; on the thermofax the date "1/14/66" appears as having been written in pencil or ink on the page of the paper of which the thermofax was a copy.

In Paragraph 2, a blank for insertion of the authorized number of shares and par value of the § 1244 stock: on both the signed form and the thermofax the number of shares was given as 1,000 and the par value $100.

Paragraph 3 of the thermofax reads as follows: "The Corporation shall offer and issue such shares of common stock from the date hereof to 1/13/68 or to the date when the Corporation shall make a subsequent offering of any stock, whichever shall sooner occur." The figures "1/13/68" appear to have been written in pencil or ink on the page of the paper of which the thermofax was a copy after a different date had been erased. On the signed form no date whatever appears in the blank where "1/13/68" appears on the thermofax.

Paragraph 5 of the thermofax page reads as follows: "The maximum amount to be received by the Corporation in consideration of the stock to be issued pursuant to this plan shall be $100,000." No amount was entered on the signed form.

After considering the credibility of testimony of Clayten and Gann on this and other points, and other evidence in the case, this court finds: that the thermofax does not represent what actually was decided at the meeting on January 14, 1966; that the blanks on page 5.2 were not due to a typist's error; but that the blanks were deliberately left open so that they might be filled in at some later time when it could be decided whether it would be to Clayten's advantage to treat the money he had advanced and would advance in the future to Inn as loans or as § 1244 stock.[3]

This finding is supported by other findings of fact.

*Finding 2.* As found above, the $30,000 check, dated January 10, 1966, drawn on Clayten's personal bank account, bore the notation "Loan to open checking account for Inn, Inc." Clayten's $5,000 check, dated January 17, 1966, payable to Inn, Inc., bore the notation "Loan". Both of these checks were posted to the ledger account "Notes Payable".

The $35,000 total of these two checks remained as credits on the notes payable ledger sheet until after Inn's original accountant was dismissed and a new accountant opened a capital stock ledger sheet on September 30, 1966. On that date he placed on the credit side of the new capital stock ledger sheet an entry of $15,000, with a notation "AE5", not adequately explained in the evidence, but reasonably explainable as representing the $15,000 earnest money paid to Jefferson by Clayten on December 15, 1965.

Thereafter, by a journal entry dated November 1, 1966, the new accountant debited the notes payable account in the amount of $20,000 and credited the capital stock account with that amount, and entered those amounts on the appropriate ledger sheets. On July 31, 1967, by an adjustment entry, he debited the notes payable account in the amount of $15,000 and credited the capital stock account with that amount and entered those amounts on the ledger sheets. The result of the November 1966 and July 1967 adjustments was to attempt to convert $35,000 of Inn's indebtedness to Clayten into capital stock. At both of those times it was clear that Inn was an unprofitable venture (as appears from Clayten's own testimony), and it had become clear that it was to Clayten's financial advantage to treat as stock what had theretofore been loans. See n. 3, above.

---

3. If Inn had been successful, it would have been to Clayten's advantage to treat the $50,000 represented by Clayten's two checks to Inn and the debit memo as loans, so that when the $50,000 or portions thereof were repaid to Clayten, the principal would not have been taxable to him and the corporation could deduct any interest it paid on such loans. If Inn proved unsuccessful, it would have been to Clayten's advantage to treat said $50,000 as having been used to subscribe to § 1244 stock.

**34**

This court further finds that the two stock certificates, one dated January 14, 1966 for 350 shares and the other dated October 14, 1967 for 150 shares, were issued at the same time, probably in October 1967.[4]

### Conclusions

■ *Conclusion A.* The $15,000 paid by Clayten to Jefferson would qualify as § 1244 stock if a plan satisfying the requirements of § 1244 had been adopted.

■ *Conclusion B.* The $35,000 represented by the loans of January 10, 1966, and January 17, 1966, would not qualify as § 1244 stock even if a plan satisfying the requirements of § 1244 had been adopted.

■ *Conclusion C.* The purported § 1244 plan did not satisfy the requirements of § 1244 because: (1) it was not adopted in conformity with T.R. § 1.1244(c)–1(c)(1), for reasons set out in Finding of Fact No. 1, above; and (2) the stock was not issued "for money or other property," as required by § 1244(c)(1)(D) of the Code[5] for the reasons set out in Finding of Fact No. 2, above.

*Conclusion D.* Plaintiffs were not entitled to an ordinary loss deduction (in the amount of $50,000 or any other amount) rather than a capital loss deduction when the stock became worthless, and, therefore are not entitled to all or any part of the refunds claimed by them in this case.

Judgment will be entered in favor of the defendant United States of America.

4. It appears from an examination of the certificate dated October 14, 1967, that it had originally been typed to show January 14, 1966, as the date of issue.

5. Set out under the heading "The Statute and Regulations", above.