MICHAEL J. DWYER AND LINDA L. DWYER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Dwyer v. Commissioner
Docket No. 2793-88
United States Tax Court
T.C. Memo 1991-65; 1991 Tax Ct. Memo LEXIS 84; 61 T.C.M. (CCH) 1911; T.C.M. (RIA) 91065; February 21, 1991, Filed *84 Decision will be entered under Rule 155.
Peter M. Wolverton, for the petitioners. Bruce W. Kent, for the respondent. GERBER, Judge. GERBER
MEMORANDUM FINDINGS OF FACT AND OPINION Respondent determined a deficiency in and an addition to petitioners' Federal income tax as follows: Addition to Tax
Year
Deficiency
Section 6651(a)(1) [1]
1981
$ 22,314.64
$ 5,578.66
The deficiencies concern the characterization of petitioners' section 1244 stock loss and several Schedule C adjustments. Petitioners contest only respondent's disallowance of the section 1244 ordinary loss deduction. Petitioners also contest the addition to tax determined by respondent. Accordingly, we must decide: (1) Whether petitioners are entitled to an ordinary loss deduction in 1981 in connection *85 with stock in a small business corporation pursuant to section 1244; and (2) whether petitioners are liable for the addition to tax pursuant to section 6651(a)(1). [2]
FINDINGS OF FACT The stipulation of facts and the exhibits attached thereto are incorporated herein by this reference. Petitioners Michael J. Dwyer and Linda L. Dwyer, husband and wife, resided in Seguin, Texas, at the time their petition in this case was filed. Petitioners' joint Federal income tax return for the *86 tax year 1981 was filed during February 1984. Pursuant to valid consents to extend the period in which to assess tax, respondent issued a notice of deficiency to petitioners for the 1981 tax year during November 1987. After several years of military employment, Dr. Dwyer commenced medical practice in San Antonio. At that time, he and a military comrade, Dr. Maxcey, attended Grace Bible Church where they met Mr. Robert Thompson. In the summer of 1976, Messrs. Dwyer, Maxcey, and Thompson established a business for the purpose of selling Christian literature. Articles of Incorporation were filed for this venture with the State of Texas, and on June 22, 1976, a Certificate of Incorporation was issued authorizing an entity named the "Association of Christian Services of Texas, Inc." (Association) to do business in Texas. Doctors Dwyer and Maxcey were the major shareholders of and capital contributors to the corporation. At the initial meeting of the shareholders in the summer of 1976, Dr. Dwyer and Dr. Maxcey made initial capital contributions of approximately $ 2,000 and $ 4,000, respectively. They testified that in exchange for their cash contributions, shares of common stock *87 were issued to each shareholder on the basis of one share for each dollar contributed. Other shareholders initially contributing to the Association included Mr. and Mrs. Frazier, relatives of Dr. Maxcey, who owned a 100-share block of Association stock which had been purchased for them by Dr. Maxcey. Dr. Maxcey testified that these shares were also issued on a dollar-for-dollar basis. Mr. Thompson was also a shareholder in the Association. However, the amount of his stock holdings was not disclosed in the record and he could not remember his percentage of ownership. Common stock was the only class of stock authorized by the Articles of Incorporation. At no point in the Association's history did capital contributions exceed $ 1 million. At the time of incorporation, the shareholders were unaware of section 1244 and took no steps to derive a stock issuance plan in order to avail the corporation of potential section 1244 tax benefits. Although they were major shareholders, neither Dr. Dwyer nor Dr. Maxcey were active in the day-to-day operations of the Association. Management of the business was handled on a full-time basis by Mr. Thompson, who was at all relevant times the *88 president of the Association. In this capacity, he was responsible for all financial affairs and for maintaining any corporate books and records, including the stock record book. Mr. Thompson employed an accountant to prepare and file tax returns for the Association. Corporate taxable income was reported on the basis of a fiscal year ending June 30. Gross receipts from all operations came from sources other than royalties, rents, dividends, interest, annuities, or the sale or exchange of stock or securities. Schedule L's from the corporate returns (Forms 1120) indicate that the amount of common stock outstanding varied widely from year to year. One such balance sheet also shows that during the fiscal year July 1979-June 1980, there was approximately $ 40,000 in outstanding shareholder loans to the corporation. During its start-up phase, the Association was in constant need of cash. Due to his financial ability, cash contributions were made by Dr. Maxcey during the first two years of the Association's existence. However, beginning in 1979, Dr. Maxcey was no longer able to make contributions to capital and Dr. Dwyer became the primary cash contributor to the corporation. In *89 June, September, and October 1979, Dr. Dwyer made cash contributions totaling $ 20,000 to the Association. He testified that he received shares of Association stock on a dollar-for-dollar basis for each contribution. Notations on Dr. Dwyer's checks, however, reflected that the contributions were made as "advances" or "loan advances" to cover operating, debt service, and inventory expenses. Mr. Thompson testified that upon receipt of a capital contribution, it was his practice to execute stock certificates on behalf of the contributing shareholder in the dollar amount of the contribution. Any stock certificates executed on behalf of Dr. Dwyer were retained by the Association with the other corporate records. Although Dr. Maxcey initially kept his certificates, at Mr. Thompson's request he returned them to the corporation in 1980 or 1981. In fact, several stock certificates issued to him were available at trial. However, the location of all other certificates (including any of those issued to Dr. Dwyer), the stock book, and the corporate records is unknown, and they were therefore not produced for trial. Prior to the end of the June 30, 1979, fiscal year, the Association acquired *90 a franchise for the operation of a retail clothing store in Pensacola, Florida, called "T-Shirt Plus." In July 1979, Mr. Thompson relocated to Pensacola to commence and manage the retail operation. In his absence, Mrs. Thompson assumed responsibility for running the Inspiration House operations. However, Mr. Thompson continued to oversee this business through daily telephone calls and return trips to Texas. Running the two businesses was difficult for the Thompsons and in an effort to unite the couple in Pensacola and to focus the business on the T-shirt operations, a decision was made in the late summer of 1979 to sell the Inspiration House store. The business was advertised through a business broker and in September 1979 a purchaser was found. On September 25, 1979, the Association entered into a lease purchase agreement and management contract with one Donald Moni. Under the terms of the lease purchase agreement, Mr. Moni was granted an option, exercisable on or before January 1, 1981, to purchase the Inspiration House business for the sum of $ 44,902.62. The agreement provided that until the option was exercised, Mr. Moni agreed to manage and operate the Inspiration House. *91 Under the terms of the management agreement, he was also required to pay monthly lease and operating expenses, including the debt service on a $ 43,259 corporate loan from Liberty National Bank secured by the Inspiration House assets. Upon exercise of the purchase option, the agreement required Mr. Moni to assume the unpaid balance of this debt, for which a final payment in the amount of $ 41,205 was due September 1, 1980. Contemporaneously with the execution of this lease purchase agreement, Dr. Dwyer paid $ 2,245 of the total brokerage fee on behalf of the Association. Petitioner stated that in exchange for this payment, 2,245 shares of stock were issued to him. Mr. Moni operated the Inspiration House pursuant to the terms of the lease purchase agreement until November 1980. Although Mr. Moni was able to make the monthly payments required under the lease purchase agreement, he could not afford the $ 44,902.62 purchase price due upon exercise of the option. Nonetheless, in November 1980 a Bill of Sale was executed between the Association and Mr. Moni transferring to him the assets of the Inspiration House business. In exchange for the assets, Mr. Moni made a payment of $ *92 15,000. This amount was credited against the outstanding bank loan. However, the bank required payment of the balance on the loan. In order to clear title to the assets and to facilitate the sale, Dr. Dwyer personally assumed the $ 26,500 balance [3] on the note and ultimately paid it off. Mr. Thompson, Dr. Maxcey, and petitioner all testified that the assumption of this indebtedness was treated as a capital contribution to the Association in exchange for which 26,500 shares of common stock were issued to Dr. Dwyer. Although the Inspiration House assets were sold to Mr. Moni for $ 15,000 on November 24, 1980, the shareholders anticipated *93 a continued return on their investment in the Association from any profits generated by the retail clothing division of the Association's operations. However, in June 1981, the company's Florida accountant advised the shareholders that, in his opinion, the Association was not authorized to do business as a corporate entity in Florida. Because the Association had not been chartered under the laws of Florida to conduct business as a corporation and was being conducted on an individual rather than a corporate basis, the accountant determined that T-Shirt Plus was effectively doing business as a general partnership. Due to the uncertainty surrounding the status of the Association, a corporate return was not filed for its fiscal year ended June 30, 1981, until the summer of 1982. At that time, Mr. Soble, the Association's attorney, prepared and filed a U.S. Corporation Income Tax Return (Form 1120) reflecting only the Inspiration House activities for the tax year ended June 30, 1981. While preparing the return, Mr. Soble realized that as of September 15, 1981, the Association had forfeited its right to do business in the State of Texas for failure to file its 1981 franchise tax reports. *94 Since he also determined that the Association had ceased business operations, Mr. Soble prepared and filed a short year final return for the Inspiration House for the period July 1, 1981, through September 15, 1981. Based on the forfeiture and the cessation of business, counsel also made the determination that the Association's stock was worthless as of September 15, 1981. On Mr. Soble's advice, petitioners deducted $ 40,148.30 as an ordinary loss on their 1981 return pursuant to the provisions of section 1244. Up until this time, petitioners were unaware that the potential for a section 1244 benefit existed. The face page of petitioners' 1981 joint return reported the loss with the statement "'Sec. 1244' Stock Loss (Assoc. of Christian Svces. Inc.) ($ 40,148.30)." Petitioners provided no other information about the loss on their return nor did they attach any statement to the return with regard to the claimed loss. On brief, petitioners sought to increase this deduction to $ 48,745, alleging it was comprised of losses on stock issued to Dr. Dwyer for his $ 20,000 cash advances to the Association in 1979, for his $ 2,245 payment of the corporations's brokerage fee in 1979, and *95 for his assumption of $ 26,500 of the Liberty National Bank liability in 1980. Petitioners, on their 1981 return, did not claim a deduction for stock issued to Dr. Dwyer upon inception of the Association in 1976 or for other contributions (if any) made by him prior to 1979. In his notice of deficiency, respondent disallowed petitioners' ordinary loss deduction on the stock. He conceded that except for the question of whether petitioners could adequately prove that the stock was issued, they otherwise met the substantive statutory requirements of section 1244. However, respondent argued that petitioners failed to comply with the section 1244 substantiation requirements. He also made the substantive argument that the issuance of stock just prior to the sale of the Inspiration House business lacked a valid business purpose and was undertaken in order to generate the ordinary loss tax benefit. On the basis of these positions, petitioners' loss deduction was characterized as a capital loss and its deductibility limited to $ 3,000. An addition to tax for petitioners' failure to timely file their 1981 return was also determined. OPINION In this opinion we consider the section 1244 *96 corporate record keeping requirements. Section 165(g)(1) generally provides that if a security which is a capital asset becomes worthless, the resulting loss should be treated as a loss from the sale or exchange of a capital asset on the last day of the taxable year. In the case of an individual taxpayer, losses on the sale of capital assets are allowed, pursuant to section 1211(b), only to the extent of gains from the sale of such assets, plus the lower of: (1) Taxable income for the taxable year reduced by the zero bracket amount; (2) $ 3,000; or (3) the sum of the excess of net short-term capital loss over net long-term capital gain and one-half of the excess of net long-term capital loss over net short-term capital gain. Pursuant to section 1244(a), an individual taxpayer is allowed to treat a loss from "section 1244 stock" as an ordinary loss. Thus, where section 1244 applies, it operates to change the character of the stock loss, thereby avoiding the capital loss limitations of section 1211(b). Section 1244(c) delineates the substantive requirements for section 1244 stock. As defined by section 1244(c)(1), "section 1244 stock" means common stock in a domestic corporation *97 if: (a) At the time such stock is issued, such corporation was a small business corporation; (b) such stock was issued by such corporation for money or other property (other than stock and securities); and (c) such corporation during the period of its 5 most recent taxable years ending before the date the loss on such stock was sustained, derived more than 50 percent of its aggregate gross receipts from sources other than royalties, rents, dividends, interest, annuities, and sales or exchanges of stocks or securities. For purposes of the statute, a "small business corporation" is defined by section 1244(c)(3) as a corporation wherein the aggregate amount of money and other property received by the corporation for stock, as a contribution to capital, and as paid-in surplus, does not exceed $ 1 million. Section 1244(e) contains a broad grant of regulatory authority for the Secretary to carry out the purposes of section 1244. Pursuant to this mandate, section 1.1244(e)-1, Income Tax Regs., was promulgated relating to records to be kept by the corporation, information taxpayers must file with their return in the year the deduction is claimed, and records that taxpayers must maintain *98 to differentiate Section 1244 stock from other stock held in the same corporate entity. [4]
*99 Respondent contends that petitioners should be denied their section 1244 deduction because: (1) Neither petitioners nor the corporation provided records evidencing stock issuances, shareholder stock acquisition and ownership, or records of corporate transactions in contravention of both section 6001 and section 1.1244(e)-1(a)(2), Income Tax Regs.; (2) petitioners failed to file certain information with their return as required by section 1.1244(e)-1(b), Income Tax Regs.; and (3) petitioners failed to maintain records to differentiate their section 1244 stock from other stock held in the corporation under section 1.1244(e)-1(b), Income Tax Regs. Petitioners argue: (1) That the corporate record keeping requirements of section 1.1244(e)-1(a), Income Tax Regs., were not yet promulgated at the time of the questioned transactions; (2) that the unavailability of the corporate records is not fatal to the claimed loss because of their offer of oral and documentary evidence containing the information required in the regulations; and (3) that the statute and regulations do not provide that a failure to strictly comply will result in the disallowance of the section 1244 benefits. To enable *100 a shareholder to substantiate his section 1244 deduction, section 1.1244(e)-1(a)(2), Income Tax Regs., directs that the corporation should maintain certain "discretionary records" [5] showing, generally, the identity of stock issues; the amount and date of issuance and the consideration received for stock; the basis and fair market value of property received by the corporation for its stock; money and property received as capital contributions and paid-in surplus; financial statements delineating the source of gross receipts for certain periods of corporate existence; and the specifics of certain section 1244 stock transactions. Special record keeping rules also apply for stock issued prior to November 1978. Contrary to petitioners' assertions, corporate record keeping requirements concerning issuee identity, issuance date, consideration/contribution type, value and basis have been in effect since January 1, 1954. See T.D. 6495, 1960-2 C.B. 226, 241-242. *101 Petitioners and the corporation were unable to locate or offer most of the corporate records or transactional documents specified in the regulation. In an effort to substantiate their deduction, petitioners introduced corporate tax returns, some of Dr. Maxcey's stock certificates, and testimony of shareholders and corporate officers regarding the Association's procedure for issuing stock. This evidence, considered en masse, was insufficient to satisfy the corporate record keeping requirements set forth in the regulations. Additionally, while we are willing, in appropriate circumstances, to allow the use of secondary evidence to prove the contents of lost documents, [6] we find that the evidence in this case does not satisfy certain fundamental elements required in the regulations. For instance, the evidence submitted did not establish the date and amount of contributions made, consideration given, or stock issued to all shareholders (e.g., Mr. Thompson). Moreover, although the testimony regarding the Association's stock issuance procedure was largely uncontroverted, in light of other evidence, it does not convince us that stock was issued on a dollar-for-dollar basis for each *102 of Dr. Dwyer's contributions to the Association. Specifically, we note that Dr. Dwyer indicated that his contributions were "loans" or "advances," for which stock certificates could not be located, while Dr. Maxcey's cash contributions were evidenced by stock certificates which were available, notwithstanding that they too were held by the corporation. Additionally, while the corporate income tax returns indicated the source of gross receipts during most years of the Association's existence, they also provided amounts for shareholder loans and common stock outstanding which do not comport with testimony by Association shareholders. Petitioners in this case have not met their burden with respect to substantiating their entitlement to the section 1244 deduction and we are therefore compelled to disallow the deduction. Welch v. Helvering, 290 U.S. 111, 78 L. Ed. 212, 54 S. Ct. 8 (1933); Rule 142(a).
*103 The statute and the underlying regulations do not provide for the level of substantiation necessary to claim the section 1244 benefits. We decline to decide which standard is to be applied because we hold that petitioners' attempted compliance with the corporate record keeping regulations did not meet the basic preponderance of the evidence test, without considering or reaching a strict compliance or substantial compliance standard. [7]
*104 Because of our holding with respect to the corporate record keeping regulations, there is no need to address the parties' arguments regarding: (1) The section 1.1244(e)-1(b), Income Tax Regs., information statement requirements; (2) the section 1.1244(e)-1(b), Income Tax Regs., requirement that shareholders maintain records sufficient to differentiate their section 1244 stock from other stock they hold in the corporation; (3) the parties' substantive arguments regarding the economic substance of Association stock issuances; or (4) petitioners' contention that respondent's brief raised the new issue of whether a failure to maintain records of pre- and post-1978 stock issuances precludes petitioners from availing themselves of the section 1244 benefits with respect to post-1978 stock issuances. The final issue is whether petitioners are liable for an addition to tax under section 6651(a)(1), which provides that if a return is not timely filed, an addition of 5 percent per month is imposed, up to a maximum of 25 percent, unless petitioners can show that "such failure is due to reasonable cause and not due to willful neglect." The burden of proof in this regard is upon petitioners. *105 Rule 142(a); Welch v. Helvering, supra. Petitioners concede that they failed to timely file the 1981 return and simply assert that the addition to tax is inapplicable should they prevail on the section 1244 issues (i.e., there will be no deficiency upon which to base the addition to tax). Because petitioners did not prevail and because they offered no evidence regarding the failure to timely file in 1981, respondent's determination on the addition to tax is sustained. To reflect the foregoing, Decision will be entered under Rule 155. Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954 as amended and in effect for the year at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. In their petition, petitioners also asserted that they were entitled to an interest abatement under section 6404(e)(1) (relating to interest assessments attributable to unnecessary delays in the performance of ministerial acts by an employee of the Internal Revenue Service). No evidence was presented regarding this issue, it was not pursued on brief, and we view the issue as waived or conceded. In any event, we lack jurisdiction to consider the matter. 508 Clinton Street Corp. v. Commissioner,89 T.C. 352↩ (1987).
3. The exact amount of the outstanding balance on the bank loan as of Nov. 1980 is unknown, but we have assumed it to be the $ 41,205 balance due as of Sept. 1, 1980. However, we are unable to reconcile the $ 295 discrepancy between the $ 41,205 balance due and the $ 41,500 in payments toward this debt. This discrepancy, however, does not in any way change the outcome of this case.↩
4. Sec. 1.1244(e)-1, Income Tax Regs., provides as follows: Records to be kept and information to be filed with the return. (a) By the corporation -- (1) Mandatory records. A plan to issue pre-November 1978 stock must appear upon the records of the corporation. Any designation of post-November 1978 stock under paragraph (c)(2) of § 1.1244(c)-2 also must appear upon the records of the corporation. (2) Discretionary records. In order to substantiate an ordinary loss deduction claimed by its shareholders, the corporation should maintain records showing the following: (i) The persons to whom stock was issued, the date of issuance to these persons, and a description of the amount and type of consideration received from each; (ii) If the consideration received is property, the basis in the hands of the shareholder and the fair market value of the property when received by the corporation; (iii) The amount of money and the basis in the hands of the corporation of other property received for its stock, as a contribution to capital, and as paid-in surplus;
(iv) Financial statements of the corporation, such as its income tax returns, that identify the source of the gross receipts of the corporation for the period consisting of the five most recent taxable years of the corporation, or, if the corporation has not been in existence for 5 taxable years, for the period of the corporations's existence; (v) Information relating to any tax-free stock dividend made with respect to section 1244 stock and any reorganization in which the stock is transferred by the corporation in exchange for section 1244 stock; and (vi) With respect to pre-November 1978 stock: (A) Which certificates represent stock issued under the plan; (B) The amount of money and the basis in the hands of the corporation of other property received after June 30, 1958, and before the adoption of the plan, for its stock, as a contribution to capital, and as paid-in surplus; and (C) The equity capital of the corporation on the date of adoption of the plan. Sec. 1.1244(e)-1(b), Income Tax Regs., relates to information to be filed with the return and provides as follows: (b) By the Taxpayer. Any person who claims a deduction for an ordinary loss on stock under section 1244 shall file with his income tax return for the year in which a deduction for the loss is claimed a statement setting forth: (1) The address of the corporation that issued the stock; (2) The manner in which the stock was acquired by such person and the nature and amount of the consideration paid; and (3) If the stock was acquired in a nontaxable transaction in exchange for property other than money -- the type of property, its fair market value on the date of transfer to the corporation, and its adjusted basis on such date. In addition, a person who owns section 1244↩ stock in a corporation shall maintain records sufficient to distinguish such stock from any other stock he may own in the corporation.
5. The use of the term "discretionary" here appears to refer to the type of records that a corporation may keep, rather than to the requirement to keep the information delineated in the regulation.↩
6. See Fed. R. Evid. 1004; Malinowski v. Commissioner, 71 T.C. 1120, 1125 (1979); Pensinger v. Commissioner, T.C. Memo 1980-104↩.
7. Courts, in most opinions involving sec. 1244 and the standard of compliance, have employed a strict compliance standard. See Godart v. Commissioner, 425 F.2d 633 (2d Cir. 1970), affg. 51 T.C. 937 (1969); Morgan v. Commissioner, 46 T.C. 878 (1966); Cournan v. Commissioner, T.C. Memo 1989-520; Cosgrove v. Commissioner, T.C. Memo 1987-401. With the exception of Cournan v. Commissioner, supra, these cases involved taxable years prior to the 1978 amendments to sec. 1244. Although Cournan involved post-1978 taxable years, the 1978 amendments are not discussed in that opinion. The 1978 amendments and the underlying legislative history may arguably support the adoption of a more lenient compliance standard regarding certain requirements in the sec. 1244 regulations. See H. Rept. 95-1445, at 107 (1978), 1978-3 C.B. (Vol. 1) at 281; S. Rept. 95-1263, at 159 (1978), 1978-3 C.B. (Vol. 1) at 315; Staff of the J. Comm. on Taxation, General Explanation of the Revenue Act of 1978, at 194 (J. Comm. Print 1979) (sec. 1244↩ stock plan requirements repealed in recognition of the need to eliminate technical requirements needlessly restricting the ability of small corporations to use the intended benefits of the statute). However, as noted, we do not reach and thus need not decide this matter.